13397

STATE v. WILLIAMS

(164 S. E., 415)

*Messrs. Rogers & Ellerbe,* for appellant,

*Messrs. M. J. Hough, Solicitor,* and *J. K. Owens,* for State.

April 29, 1932.

The opinion of the Court was delivered by MR. CHIEF JUSTICE BLEASE.

On September 14, 1930, the dead body of John L. James, a white man about fifty years of age, of Laurinburg, N. C., was found in an automobile on Highway No. 9, in Marlboro County, at a point about two hundred yards distant from a house known as "the old Charles Irby house," where negroes resided. The examination of the attending physicians showed that death was caused by a knife wound inflicted upon the right side of the neck of the deceased, about an inch below the angle of the jaw, the wound extending about two and one-half inches in length and varying from one-half of an inch to one and a quarter inches in depth, cutting the jugular vein.

The investigations as to the death of James, made by the peace officers, brought on the arrest of several colored persons, some as witnesses, others as defendants, and finally re-

sulted in the filing of charges that Hilton Williams, Tommy Newton, Johnny Moore, Julia Moore, Streater Scott, and Walter Coachman, all colored, were involved in some manner or other in the homicide of James. Hilton Williams and Tommy Newton fled to the State of Georgia, but were soon apprehended.

At the September, 1930, term of the Court of General Sessions for Marlboro County, the grand jury returned an indictment charging Hilton Williams and Tommy Newton with the murder of James, and Streater Scott, Walter Coachman, Johnny Moore, and Julia Moore as accessories after the fact to the murder. The defendants were arraigned on September 23d, and entered pleas of not guilty. On motion of counsel for some of them, including Williams, his Honor, Judge Grimball, then presiding, continued the case beyond the term.

At the February, 1931, term of the Court, because of illness in the immediate family of one of the attorneys for the defendants, the case was again continued. At that term, the defendant, Newton, was also indicted in a separate bill as an accessory after the fact.

The case, on the first indictment, finally came on for trial before his Honor, Judge Dennis, at a special term of the Court of General Sessions, convened on May 4, 1931. Messrs. Rogers & Ellerbe appeared as attorneys for the defendants Hilton Williams, Streater Scott, and Walter Coachman, and announced that they did not appear for the other defendants. The presiding Judge assigned Messrs. Evans and Freeman of the Bennettsville bar to represent Johnny Moore and Julia Moore. Those two defendants, after conference with their attorneys, announced withdrawal of their former pleas of not guilty, and formally entered pleas of guilty of the crime charged against them. The charge of murder against Newton was nol prossed by the solicitor, and no counsel was appointed to represent him. The indictment against him on the charge of accessory after

the fact remained of force. Julia Moore and Newton were used by the State as witnesses against their codefendants.

Hilton Williams, charged alone as principal in the murder, and Streater Scott and Walter Coachman, charged as accessories after the fact, were tried together. The trial lasted three days. The jury convicted Williams of murder, and he was sentenced to death by electrocution. The defendants Scott and Coachman were convicted as accessories after the fact, and were sentenced to imprisonment for a term of one year. After the trial of Williams, Scott, and Coachman, Newton entered a plea of guilty on the accessory charge against him, and received a sentence of six months' imprisonment. Johnny Moore and Julia Moore, on their pleas of guilty, were also sentenced to imprisonment, but we do not find it clearly stated in the record what sentences were imposed upon them.

The appeal to this Court is on the part of the defendant Hilton Williams alone.

The essential facts of the homicide, according to the theory of the State, as developed in the testimony it presented, were as follows : James, not known to any of the defendants, late in the afternoon or early night of September 13, 1930, was in the vicinity of "the brickyard," not far from the Irby house, occupied by Julia and Geneva Moore. James met up with Tommy Newton, a boy of seventeen years, and engaged Newton to drive his automobile for him, the two to go back in a little while to North Carolina. Newton desired to get some clothes from his home, and at his instance James went with him to the Irby house that Newton might get in touch with a colored woman who would let him have the clothes. On arrival at the Irby house, Julia Moore, Geneva Moore, and Frances Bradley, nicknamed "Sweet," were on the porch of the house. Newton and the colored women engaged in conversation, with particular reference to locating the woman whom Newton desired to see about the clothes. The woman was expected to return soon, and

for that reason James and Newton waited. James did not go into the house, but he walked "around the house." While Newton was sitting in the car alone, Hilton Williams came up, spoke pleasantly to Newton, and went into the house. He was followed therein by "Sweet." While Williams was in the house, James came back to the car and seated himself therein by Newton. Some fifteen or twenty minutes later, Williams came from the house, approached the car, and asked Newton for a drink of whiskey. Newton replied that he had no whiskey. Williams then asked James, who evidently had been drinking, for a drink of whiskey, and James denied having any. Upon James' inquiry who Williams was, the latter gave his name. James and Williams became involved in an argument and cursing as to Williams being a "bad man." While James was still seated in the car, Williams grabbed him in the collar and cut him in the throat with his knife. Newton jumped out of the car, at the time begging Williams not to attack James. James had no weapon, and made no effort at any time to injure or attack Williams. Williams and Newton ran away, the latter claiming he was afraid to remain, his act of running being due mostly to his fear of Williams. James got out of the car, with the evident purpose of getting into the house, but fell on the way. Newton and Williams returned in a few minutes to the place of the difficulty, and found James still living. Upon inquiry if James wished to go to a doctor, the dying man replied "No." Within a few minutes he expired. The women, Julia Moore, Geneva Moore, and Frances Bradley, were not in the yard when the difficulty happened, and right after the fight they left the house. Newton and Williams left again. Later Williams, Newton, Johnny Moore and Julia Moore returned to the scene of the difficulty. Williams drove James' automobile from the yard to the highway, and in his operation of the machine stripped its gears so it would not run. Williams, Newton, Johnny Moore and Julia Moore removed the dead body of James from the yard, and placed

it in the automobile, using in the moving a pole, produced in the Court, owned and kept by Julia Moore in connection with her clothesline. After the body was placed in the automobile, the machine was pushed along the road for about a hundred yards. From the body of James, Williams took some money, said to be a little more than $2.00 in change, and some papers, and perhaps a watch of the deceased. Williams and Newton decided to leave the country, Newton claiming that his agreement to go was due to advice given to him by his uncle, Streater Scott, and because Williams told him that both the latter and Newton would be lynched. Walter Coachman, Streater Scott, and others accompanied Williams and Newton, in an automobile, to Society Hill, Coachman driving the car. At Society Hill, Williams and Newton took a train for Georgia, Williams, with money of his own, and contributions furnished him by his relatives, paying the necessary expenses of the trip for Newton as well as for himself. The knife used by Williams in the affray was given by him to his mother, who threw it in a well, but later caused it to be recovered, and turned it over to counsel for her son.

The evidence for the State, as summarized, came mainly from Newton. Some of the testimony given by that witness, however, was corroborated by other witnesses, particularly Julia Moore and Geneva Moore. The two women positively asserted that James at no time went into the house. Some circumstantial evidence, tending to show that the difficulty between James and Williams occurred in the yard and about the automobile, was related by the peace officers who visited the scene of the difficulty soon after the death of James was discovered.

The appellant admitted the killing of James and pleaded self-defense. The facts, as related by him, went this way: The home of Julia and Geneva Moore was a resort for immoral purposes, visited by both white and colored men. On the day preceding the night of the difficulty, through Julia

Moore, he had made an appointment for "Sweet," whose right name he did not know, to meet him for immoral purposes at Julia's home that night. He arrived there about 10 o'clock in the night. On arrival he found James and Julia Moore sitting at the end of the porch. Newton and "Sweet" were at the car. The appellant and "Sweet" went into the house, going to the dining room. Newton and Geneva Moore went into the one bedroom of the house. James and Julia Moore went into the hallway. After about twenty-five minutes the appellant and. "Sweet" went from the dining room into the bedroom. Intending to leave the house, the appellant started to the front door and found James and Julia in the hall in a compromising position. James reproached the appellant for "running upon him and a woman," and told the appellant that both of them could not play with the same woman. Appellant replied to the effect that he meant no harm, and that all of them were there "for a good time and not for trouble." James made some remark about a pistol, got up from the floor, having in his hand a piece of iron about two and·one-half feet in length—"something like a lightning rod"—and struck Williams twice. The two men tussled in the hall and from there got to the porch. On the porch, while they were clinched and the fighting was continuing, the appellant drew his knife from his pocket, opened the blade and cut James one time in the throat. After being wounded, James walked away and fell down the steps, rolled to the bottom, then got up and started toward the automobile. In about five feet of the car, ·James fell. At the time of the difficulty, Newton, Julia Moore, Geneva Moore, and "Sweet" were in the house. Newton and the appellant went from the Irby house to "Sweet's" house, but found no one there. The appellant insisted that, Newton go back and see how bad James had been hurt. Newton declining to go by himself, the appellant accompanied him. James refused Newton's suggestion to be carried to a doctor. Newton and Williams moved the automobile down the road and found it

would not run. Newton and the appellant went to the home of the appellant's sister where he found Streater Scott. The appellant, Newton, Johnny Moore, Julia Moore and Geneva Moore went back to move the body of James, although the appellant did not then know James was dead. Upon that return, James was found to be dead, and the body was removed by the appellant, Newton, Johnny Moore, Julia Moore and Streater Scott. Appellant vigorously denied taking any money, papers, or watch from the body of James. He and Newton were conveyed in an automobile, driven by Walter Coachman, accompanied by Streater Scott and others to Society Hill, at which point Newton and the appellant took a train for Georgia.

The appellant endeavored to show, by cross-examination of the State's witnesses and introduction of evidence taken at the coroner's inquisition, with some degree of success, that the testimony given by Tommy Newton, Julia Moore and Geneva Moore in the trial was not in accord with some statements those witnesses had formerly made as to the difficulty.

In reply, the State showed by the testimony of two peace officers that the appellant had told the officers that in the difficulty with James the appellant, while holding with his right hand James against a post on the piazza, with his left hand took his knife from his pocket, opened the same with his teeth, and then cut James. This statement, to which the officers testified, had been denied by the appellant on his cross-examination.

The transcript of record is typewritten and contains 185 pages. All the evidence is set forth. There is no index and no folio markings. In the typewritten briefs, submitted on behalf of both the appellant and the State, except in one instance in appellant's brief, there is no reference to any page of the transcript. We have done the best we could, after much laborious reading, to make a fair statement of the facts, as they were contended to have been by both sides,

that the legal issues, before us for determination, may be clearly understood and properly decided.

Originally, ten exceptions were made. One of these contains four subdivisions. On the hearing in this Court, we granted the appellant's motion to add another exception. Many of the exceptions are in general terms, lengthy, and argumentative; and some do not comply with our rules. But the appellant was sentenced to the extreme penalty under our law, and, therefore, we have followed the practice, often sanctioned by this Court, of carefully reviewing his trial, without regard to technical rules. It is not necessary to set out the exceptions verbatim. We shall pass upon the "questions involved," as appellant's counsel have stated them in their argument, adding thereto the one arising out of the additional exception we allowed, and another overlooked in counsel's statement.

In the first question submitted, complaint is made that the presiding Judge committed error and abused his discretion in his refusal to grant a severance in the case, so that the appellant could be tried separately from his codefendants, charged with being accessories after the fact, who were allowed to change their pleas of not guilty to guilty pleas by agreement between the solicitor and counsel appointed by the Court to represent those defendants, all of which happened about the time of the commencement of the trial and in the presence of the jurors drawn to hear the case.

The statement of the question carries the concession that the matter of granting or refusing a severance in a criminal case lies within the discretion of the trial Judge, which rule of practice is so well established by our decisions that it is no longer necessary to cite authority for the proposition.

As we understand the occurrences in the trial, the defendants Johnny Moore and Julia Moore, who changed their pleas of not guilty to pleas of guilty, were charged in the same indictment with the appellant, who

was alleged to have been a principal in the murder; and, until these two defendants had withdrawn their former pleas and entered their last pleas of guilt, there was no motion on the part of the appellant, or any other defendant in the case, for a severance. The result of the entering of the *nolle prosequi* on the part of the solicitor as to the defendant Newton in the indictment, wherein both the appellant and Newton were charged as principals, was to eliminate Newton as a defendant in that case. That accomplished a severance so far as trials of the appellant and Newton were concerned. The defendants Johnny Moore and Julia Moore clearly had the right, under the law, to withdraw their pleas of not guilty and to enter pleas of guilt. The result of that was to sever the trial of the appellant from any trial of Johnny Moore and Julia Moore; in fact, it made unnecessary a trial of Johnny Moore and Julia Moore. So it would appear clearly to us that the appellant obtained what he desired, a severance of his trial from any trial of Newton, Johnny Moore, or Julia Moore.

The main thing really urged in this question, we think, is the fact that Johnny Moore and Julia Moore were allowed, in the presence of the jurors who would be called upon to try the appellant, to withdraw their pleas of not guilty and interpose pleas of guilty. We are unable to see, however, how this could have been well prevented. As stated before, those two defendants had the right to withdraw their former pleas and plead guilty. As defendants, charged with a felony in the Court of General Sessions, they could only enter their pleas in open Court, and it was proper for them to do so before the commencement of the trial. In the case where they were charged in the same indictment along with the appellant, their rights had to be preserved and protected by the Court. At the time of their changed pleas, there had been no motion for severance on the part of the appellant, or any other defendant in the case. If the acceptance of the pleas of guilty on the part of these

two defendants had been postponed until after the trial of the appellant, we cannot see wherein the appellant would have received any benefit. The testimony of these two defendants, as witnesses for the prosecution, contained admissions of their guilt as accessories after the fact. The trial jury got from their testimony all the mental impressions and convictions—perhaps more—that they could possibly have received from hearing entered the formal pleas of guilt.

The question involving the matter of severance, as stated by the appellant's counsel, does not appear to have any reference to any motion to separate the trial of the appellant from that of his codefendants Scott and Coachman. But the record shows, we think, that such motion was made, and the exception (No. 2), touching the refusal to grant the severance, also indicates that the appellant urges here, as he intended to urge in the lower Court, that he should have been allowed the right to be tried alone. So we pass also on that particular question.

An examination of all the record, paying especial attention to the testimony of Williams, Scott and Coachman, shows convincingly that the appellant suffered no harm because of his trial with those two defendants. The appellant admitted killing the deceased. He testified that Scott helped him to move the dead body. He said that Scott and Coachman were in the automobile on the trip to Society Hill, and that both of them knew of the difficulty he had with James. Coachman, in his testimony, admitted that before he left home to go to Society Hill he had learned that the appellant "had cut a man," and on the road to Society Hill he was informed that the man who had been cut was dead. Scott, while denying that he helped to move the body of James, admitted that he had been informed of the difficulty prior to the trip to Society Hill, and he admitted taking that trip with the appellant.

There was little, if any, conflict as to the interests of Williams on the one hand and the interests of Scott and Coach-

man on the other. That seems conclusive since all three of them were represented by the same counsel. If there had been any material conflict as to the rights of these defendants, the highly reputable counsel would not, of course, have undertaken the defense of all three.

Taking all the circumstances into full consideration, we are unable to find any error in the refusal to grant any motion for severance that was offered.

By the second question made, it is urged that the trial Judge abused his discretion in refusing the request of the appellant's counsel to keep the jury together all during the trial, since it appeared that there was much hostile sentiment toward the appellant among the crowd attending the trial. It is not so stated in the question submitted by the appellant, but the exception (No. 7) shows that the request of counsel that the jury be kept together was made privately. We are unable to find in the record anything showing that such a request, either privately or publicly, was made. Under the circumstances, however, we will consider the question as if the record did show that the request of counsel was made in some way, either privately or publicly, and we will asume that it was refused.

The trial Judge may keep a jury together, or he may allow them to separate, during the trial, and this Court will not upset any action he takes thereabout, unless it clearly appears that the discretion given him under the law was abused. This rule applies even in capital cases. See, generally, *State v. Johnson,* 159 S. C., 119, 155 S. E., 599; *State v. Bates,* 87 S. C., 431, 69 S. E., 1075; *State v. Stewart,* 26 S. C., 125, 1 S. E., 468; *State v. McKee,* 1 Bailey (17 S. C. L.), 651, 21 Am. Dec., 499; and *State v. Belcher,* 13 S. C., 459. We do not find in the record that any showing was made to the Court that necessitated the jury being kept together in the trial of this case. The trial Judge was on the scene, and, in all probability, in close touch with everything in the trial of the case. No complaint was made in the Court

during the trial of the appellant, or on his motion for a new trial, that any improper influences of any kind were brought to bear upon the jury as a whole, or any member of the panel, and no attempt to bring such influence upon any juror was disclosed. In the absence of any showing to the contrary, we must assume that each and every member of the jury sought honestly and impartially, under the law, to discharge his duty; and that he observed the oath required of a juror. At best, it only appears that the opinion of appellant's counsel was that the jury should not have been permitted to separate. While respecting the opinions of the distinguished attorneys, this Court, because of them, without legal showing to support the views expressed, could not come to the conclusion that there was prejudicial error to the appellant in the declination of the trial Judge to keep the jury together.

Soon after beginning his charge to the jury, the trial Judge informed them that Johnny Moore and Julia Moore had pleaded guilty to being accessories after the fact, and they were not on trial. In his address to the jury, the solicitor made a similar statement. By the third question presented, it is alleged that the statements of the Judge and solicitor prejudiced the case against the appellant. It was almost necessary, and, if not necessary, certainly it was proper, that the jury be instructed that they were not to render a verdict as to Johnny Moore and Julia Moore, although their names appeared in the indictment as defendants—this for the purpose of having the jury's verdict presented in the proper form. The statement of the solicitor was not out of place either, for oftentimes it is the duty of a lawyer, in his address to the jury, to assist that body in a clear understanding of the issues to be determined by it. Aside from these considerations, the jury already knew what Johnny Moore and Julia Moore had done in the trial of the case, for those two defendants, in their sworn testimony, had admitted that they were accessories after the fact. It is

impossible for us to see how the appellant suffered any legal prejudice because of the matters here complained of.

The fourth matter makes the suggestion that the presiding Judge erred "in passing upon the motives and purposes of investigating officers and their conduct as innocent and proper when such should have been a question for the jury alone to determine." In the argument, we find no reference to that part of the record touching the complaint made. In a careful reading of all the testimony, we are unable to find anything whatever indicating that the trial Judge gave expression of his opinion in any way as to the conduct, motives, or purposes of the investigating officers. We think that the expressions of the Judge, to which appellant's counsel have referred, occurred on a motion made by the appellant to reopen the case for the purpose of taking testimony, after all the evidence had been introduced, and all the counsel had completed their addresses to the jury. After the attorneys had finished their speeches, late in the afternoon, the Court was recessed until the following morning, and the Judge announced that he would deliver his charge upon the reconvening of the Court. On that morning, the Court, having been advised that counsel for the appellant wished to make some motion in connection with the case, stated "it may be necessary to discuss some of the evidence," and the jury were sent out of the courtroom. Counsel for the appellant then moved that the case be reopened for the purpose of permitting the appellant to place the coroner of the county on the witness stand, so that he might testify that, prior to the examination of witnesses at the inquisition over the dead body of James, certain peace officers carried the witnesses to the office of the magistrate, and had them there to make certain statements by affidavit. It seems the purpose of appellant's counsel was to show that improper influences had been brought to bear upon the witnesses for the State. An affidavit of the coroner was presented to the Court. Quite a colloquy occurred during the

hearing of this motion between the presiding Judge and one of the counsel for the appellant. In his argument, the attorney strongly intimated that improper influences had been brought to bear upon certain witnesses for the prosecution. The Court remarked that the counsel had used "pretty strong language * * * and a pretty strong charge to make against an officer, especially when Julia Moore comes into Court without intimidation and pleads guilty to being an accessory." The result of the motion was that the Judge agreed to allow a part of the affidavit of the coroner, which he thought was relevant and not hearsay, read to the jury, and the attorney for the appellant expressed his satisfaction at that decision. Counsel for the appellant stated that he did not care to argue the case further to the jury. The jury were brought back into the courtroom, and the part of the affidavit held by the Court to be competent was read to the jury. It does not appear that the jury had any information whatever as to the remarks of the trial Judge. In the absence of such showing, it is impossible to see how the appellant was prejudiced by the occurrence or any language of the Court.

Appellant complains, in his fifth question for our determination, that the trial Judge erred "and showed a prejudiced mind in shutting off argument of his counsel on a motion for a new trial."

In *State v. Long*, 93 S. C., 502, 77 S. E.; 61, 63, where the Court considered the right of a convicted defendant to have his counsel heard in full on a motion for a new trial, the proper rule about the matter was stated in this language: "We think the exceptions raising this question should be overruled, as it is a matter in the discretion of the presiding Judge as to how long he will permit argument, and how it is to to be argued, on a motion for a new trial. The facts of the trial are usually fresh in his mind, and he has some discretion as to whether he will allow a retrial of the whole case before him, and a reargument of the whole case inflicted on him, or only direct attention to certain questions that he

wishes discussed. This wise discretion on the part of the Judge we are confident will not be often abused; and the parties moving for a new trial will usually be accorded a full, patient, and ample hearing; and in this case we see no erroneous exercise of authority or power on the part of his Honor, the trial Judge."

In the case at bar, it appears that written grounds, upon which the motion for a new trial was based, were submitted to the Court. The grounds referred mostly to matters of fact. After counsel's preliminary remarks, in submitting the written grounds of the motion, the Court, after having heard all the grounds read, told counsel that he wished to ask about certain of the grounds. The Court obtained information from the solicitor and the sheriff as to certain particular grounds. We do not know how long it took the Court to consider the motion for a new trial. It required nearly three pages of the typewritten record before us to reproduce the grounds of the motion. It took a little more than five pages of that record to set forth all that was said in the hearing of the motion. At one point, when one of appellant's counsel had argued the question as to a certain portion of the charge to the jury, the Court said, "Go ahead. If you have any authorities on it, I will hear you." The attorney replied that he had nothing "but the bald proposition," and he thought the Court had committed error. The Judge did say on two or three occasions that he saw no ground for a new trial, and there was no need to make further argument. He took the time to add that he thought the defendant in the case had received a full and fair trial as could be had. In complimenting the work of the attorneys who had represented the appellant, he said that, if the appellant "had been one-tenth of one per cent. as good a witness as his lawyers were lawyers, he would have come out better." Following the rule announced in the *Long case,* we are unable to find error in the matter here complained of.

In the sixth question, it is urged that the testimony in the case showed that a new trial should have been granted by the presiding Judge, if he had considered it "with a fair and impartial mind."

The first difficulty in the appellant's position rests, we think, in the opinion of his counsel that a trial Judge should substitute entirely his views of the evidence in a case for the views of the twelve jurors. That is not the law. It may be well oftentimes, too, for defendants in criminal cases that this is not the law. The trial Judge is not a juror. It is his duty, when absolutely convinced that a jury has made a mistake in finding a verdict against one charged with crime, to set the verdict aside. To be so convinced, however, he must consider all the evidence in the case, and he is not to accept alone the evidence of the defendant.

Another difficulty, we think, with the position of appellant's counsel is due to their sincere belief, strong evidences of which appeared in their arguments before the bar of this Court, that the appellant has been too severely dealt with in the lower Court. The manner in which the counsel have fought for their client's life and liberty has impressed us much. Unfortunately for the appellant, the jurors, who saw him and all the other witnesses, heard him and all the other witnesses testify, were not so impressed, in spite of the zeal displayed by earnest and loyal counsel. Sympathizing with the terrible situation surrounding the appellant, we have read carefully every word of the evidence in the case; and, as a matter of law, we cannot possibly say that the trial Judge committed error in holding that the evidence was sufficient to warrant the appellant's conviction.

Another question—the one not referred to in the statement of counsel as to "questions involved"—is made in the eighth exception. It refers to the instructions given the jury by the Court as to the corroboration of testimony of an accomplice, and it is alleged that there was error in that the instructions did not go far enough.

Just before beginning his argument to the jury, Mr. Rogers, of counsel for the appellant, without submitting written requests, as required by the rules of Court, made a preliminary statement and argument on the law as to the necessity of corroboration of the testimony of an accomplice. The counsel eloquently and forcefully portrayed his view of occurrences he thought had taken place with regard to the witnesses in the case, especially those who had been charged with the crime of accessories after the fact. The request was made that the Court instruct the jury that they should consider with caution the testimony of the witnesses who were indicted as accessories. At the conclusion of the argument, J. K. Owens, Esq., assistant counsel for the State, who closed for the prosecution, informed the Court that there was no objection on the part of the prosecution to the granting of the special request to charge on the part of appellant's counsel.

In charging the jury on the law as to accomplices and accessories, the trial Judge used the following language: "There are two of these defendants charged with being accessories, or accomplices. Now, the law for many, many years has viewed with critical eye the testimony of an accomplice, and many of the Courts have said that it is proper for a jury, in passing on the evidence of an accomplice, to scrutinize it closely. That is due to the fact that the accomplice might have some ulterior motive, that is to say, in trying to take care of himself, or some sinister motive that an ordinary witness might not have."

During the charge, counsel for the appellant argued to the Court, to the effect, that once it had been "the law of the land * * * that it was unsafe to convict a defendant upon the testimony of an accomplice, unless it was corroborated by reliable evidence." He said that the Supreme Court had modified that to some extent, but "exactly how far I don't know." He requested the Court to charge the same principle, to wit, that it is unsafe to convict on the testimony

of an accomplice, unless there was corroboration. The trial Judge said he had asked that written requests to charge be submitted, if any special definition was desired, that none had been furnished, and that he had charged the jury the law applicable as to accomplices.

There can be no doubt that under the law of this State, recognized in many decisions of this Court, a jury may rest a conviction of a defendant on the testimony of an accomplice, and the sufficiency of the evidence of an accomplice, whether corroborated or not, is for the jury. *State v. Johnson,* 119 S. C., 55, 110 S. E., 460; *State v. Kennedy,* 85 S. C., 146, 67 S. E., 152; *State v. Weldon,* 89 S. C., 308, 71 S. E., 828, 829. In the case last cited, this Court approved this statement of the law as announced by the trial Judge: "The law in this State for a long number of years was declared by our Supreme Court to be that it was unsafe to convict upon the uncorroborated testimony of an accomplice. But our Supreme Court has recently changed that doctrine, and it is not the law now. The law in regard to the testimony of an accomplice is just like it is as to the testimony of any other witness in a case. That is to say, that you are the sole judges of the weight you should give to such testimony."

If there was any error at all in the instructions in the present case, such error was favorable to the appellant. However, it is our opinion that there was no error, for we think the Judge was right in telling the jury, as he strongly intimated to them, that they *should scrutinize closely* the testimony of the alleged accomplices, and certainly the language of the Judge was beneficial to the defense of the appellant.

The additional exception permitted by this Court relates to the charge as to "malice." Appellant says that there was error in the definition of "malice" as declared by the Judge, when he used the following language: "Now malice in a case of this kind doesn't mean hatred in the sense you sometimes speak of hatred. In its legal significance malice is the doing of an unlawful act intentionally

and wilfully, without justification or excuse. When a man does an unlawful act, without justification or excuse, intentionally and wilfully, you imply malice. That is what is meant by malice."

It was stated at the bar of the Court that this exception was sustained, in the opinion of counsel, by our recent decision in *State v. Howell,* 162 S. C., 394, 160 S. E., 742. It is clearly our view that counsel have misconstrued the holding in the *Howell case,* and that the charge of the Judge in this case was in harmony with the law declared in the *Howell case.* Therein, we approved the definition of malice laid down by Judge D. L. Wardlaw, in the case of *State v. Doig,* 2 Rich. (31 S. C. L.), 179, where he defined malice as follows: "In law, malice, is a term of art, importing wickedness and excluding a just cause or excuse. It is implied from an unlawful act wilfully done, until the contrary be proved."

In the *Howell case,* in the definition of malice given by the trial Judge, he left out what this Court said was "the very essence of malice," namely, "that the wrongful act must have been done intentionally *and without just cause or excuse."* The "heart of malice," the doing of the act intentionally *without just cause or excuse,* was included by the trial Judge in this case in his definition of malice. While he used the words "without justification or excuse," instead of "without just cause or excuse," we are unable to see any real distinction in his language and the language of Judge Wardlaw. "Just cause or excuse" and "justification," we regard as being synonymous. "Justification" is defined as follows: "In law generally, a sufficient lawful reason why a party did or did not do the thing charged." 35 C. J., 896. See, also, Black's Law Dictionary, page 674, and Webster's New International Dictionary, page 1174.

In the last question submitted by counsel for appellant, it is urged that the defendant did not receive the fair and impartial trial guaranteed to him by the

Constitution of this State (Const. Art. 1, § 18), and that this Court would not be warranted in approving his conviction and sentence to death. The proposition advanced is evidently based upon the first exception, whereby the question is raised that the defendant was "deprived of a fair and impartial trial." In four lengthy subdivisions of that exception, there is set forth what is practically a résumé of all the exceptions made by the appellant and all the positions taken by him in the lower Court and on this appeal. The exception and all the subdivisions deal principally with matters of fact and occurrences in the trial. Among the matters recounted are these principal things: The withdrawal of pleas of not guilty by some of appellant's codefendants, and their later pleas of guilty, in the presence of jurors called to try the case; the refusal of the motion for severance; the arrest and incarceration of eyewitnesses, and the refusal to allow them to talk to any one connected with the defense of the appellant; the suggestion that Tommy Newton and other eyewitnesses had been promised leniency, provided they testified against the appellant; the light sentences imposed upon accessory defendants who pleaded guilty, and the agreement on the part of the "eyewitnesses" as to a concerted line of testimony to place the entire blame of the killing of James upon the appellant. With the exception of the statement as to the withdrawal of the pleas of the defendants charged as being accessories, the matters set forth in the exception are not, in our opinion, borne out by the record. We find no evidence that on proper demand the appellant's counsel, or other proper person interested in his behalf, was denied the legal right to talk to witnesses. The statement of the sheriff, in open Court, that he had not declined any proper request was not contradicted. While counsel for the appellant, on cross examination, asked many questions in an effort to show that leniency had been promised to Newton, Johnny Moore and Julia Moore, if they testified unfavorably to the appellant, the answers of the witnesses were always to the

effect that they had not been so promised. There is nothing in the record which could possibly convince this Court that the testimony given was untrue.

To sustain the exception under consideration, counsel for appellant have cited some of the language of the late beloved Chief Justice of this Court, Hon. R. C. Watts, in the case of *State v. Douglas,* 115 S. C., 483, 101 S. E., 648, 649, 8 A. L. R., 656, and this is the only citation of authority in counsel's whole brief. Therein, that great jurist, in his own language, announced a principle with which we thoroughly agree. He said this: "In the trial of a cause involving human life or any other felony the trial should be conducted in a manner free from wrongdoing, or even a suspicion of wrongdoing."

But, in the enforcement of the principle declared in the *Douglas case,* this Court cannot, without proper showing, assume that a trial in a lower Court has been conducted in a manner not free from wrongdoing or the suspicion of wrongdoing. The record presented to the Court must be taken to be true, especially when the record has been made up, as in this case, by the appellant's attorneys. As already indicated, the result of a trial in a lower Court may not be disturbed by this Court for the sole reason that counsel for the appellant are of the opinion that their client has not been fairly treated. Under our system of jurisprudence, this Court, and all other Courts, must, within the law, uphold the great right of jury trial, and, when a jury of the country has spoken, its verdict must be presumed to have been correct. Such verdict may not be upset, unless it clearly appears that legal error, prejudicial to the rights of one charged with crime, has been committed. The jurors in this case, the record discloses, were closely examined on their voir dire by the presiding Judge and counsel. The case was not tried for more than seven months after James had been killed. By that time the citizenship of the county had plenty of time to return to a state of normality, and to con-

sider everything carefully and dispassionately, even if, as suggested by appellant's counsel, there had been formerly some hostile sentiment against their client. We may add that there is nothing in the record, except expression of opinion of counsel, that there had been any undue hostile sentiment. On two occasions, at the request of appellant, the trial of the case was continued. A careful study for many days of the whole record, as presented to this Court, does not bear out the suggestion that any constitutional right of the appellant has been violated.

The judgment of this Court is that all the exceptions be overruled, and that the judgment of the Court of General Sessions for Marlboro County be, and the same is hereby, affirmed.

MESSRS. JUSTICES STABLER, CARTER and BONHAM concur.

ON PETITION FOR REHEARING

*Per curiam.*

Within the time permitted by the rules of this Court, counsel for the appellant filed a petition for a rehearing in the cause, wherein we heretofore affirmed the judgment of the Court of General Sessions for Marlboro County. In their petition, and the argument submitted therewith, the learned counsel have again displayed strong evidence of their sincere belief that the judgment, adverse to their client in the lower Court, was entirely too severe. They insist strongly that there was error in our former decision. Three members of the Bennettsville bar, Messrs. W. M. Stevenson, N. W. Edens, and R. P. Bellinger, outstanding lawyers in their section, whose views are always entitled to the careful consideration of this Court, have certified that, in their opinion, the petition for rehearing "is meritorious."

Since the result of the cause to the appellant is so grave, and his counsel are so insistent that there was error in the conclusion reached by this Court, which view is supported by the opinion of the worthy attorneys we have named, the

Court has taken considerable time to study carefully the petition for rehearing, and in connection therewith to go over again the record before us.

The sole ground upon which the petition is based relates to the holding of this Court that there was no error on the part of the trial Judge in refusing to grant the appellant's motion for a severance.

In the opinion we delivered, we said: "As we understand the occurrences in the trial, the defendants, Johnny Moore and Julia Moore, who changed their pleas of not guilty to pleas of guilty, were charged in the same indictment with the appellant, who was alleged to have been a principal in the murder; and, *until these two defendants had withdrawn their former pleas and entered their last pleas of guilt, there was no motion on the part of the appellant, or any other defendant in* the case, for a severance." (Italics added.)

Regarding the statements quoted, the petition for rehearing sets forth this: " * * * The Court based its finding upon the assumption that the motion for a severance was made only after the codefendants, Johnny Moore and Julia Moore, had plead guilty to being accessories after the fact of murder while the facts are, and *the record discloses, that the motion for a severance and a continuance of the case of Hilton Williams was made by counsel for Hilton Williams before the pleas of guilty of Johnny Moore and Julia Moore were made and accepted and published by the Court."* (Italics ours.)

Counsel for the appellant have now pointed out, at certain places in the transcript of record, statements there appearing which indicate that they may be correct in the position they take—*that a motion for a severance was made in behalf of the appellant before the defendants Johnny Moore and Julia Moore entered formally, in open Court, their pleas of guilty as to the charge of accessory after the fact, for which they stood indicted.*

A correct statement of the occurrences in the trial Court, with relation to the motion for severance, and some matterrs occurring before that motion was interposed, appears now to be as follows: At the September, 1930, term of the Court, with Judge Grimball presiding, all the defendants were arraigned. Messrs. Rogers & Ellerbe appeared for the appellant and Newton and Coachman, two other defendants. Johnny Moore, Julia Moore, and Streater Scott were not at that time represented by counsel. At the request of the Court, Mr. Rogers assisted the unrepresented defendants in the arraignment, but announced, "I don't want that to be a committal to anything further than the arraignment," in which announcement Judge Grimball readily acquiesced. All the defendants pleaded "not guilty." The case was continued on the motion of Mr. Rogers of appellant's counsel. *At that term of the Court no request for a severance was made.*

The case was also continued at the next term of the Court. *No request for a severance was made at that term.*

At the May, 1931, term, when the appellant was tried, his Honor, Judge Dennis, presiding, Mr. Rogers announced that his firm only represented the appellant, Streater Scott, and Walter Coachman; and informed the Court that the other defendants were not represented "in so far as I know." The solicitor entered a *nolle prosequi* as to the charge of murder against Newton, and informed the Court that at the previous term an indictment, charging him with accessory after the fact, had been returned by the grand jury. Mr. Rogers inquired of the Court if it was "competent, after arraignment to nol. pros. that case?" The trial Judge replied in the affirmative. After the *nolle prosequi* was entered, Newton was not charged in the same indictment with the appellant. Johnny Moore and Julia Moore were charged in that indictment. After ascertaining that Johnny Moore and Julia Moore were not charged with murder, the presiding Judge said they were not entitled, under the law,

to have counsel, but, under the circumstances, he would assign counsel any way; and counsel were assigned.

The record does not show clearly the exact time in the proceedings when Johnny Moore and Julia Moore, either in person or through their assigned counsel, announced that they would withdraw their former pleas of "not guilty" and interpose pleas of guilty, but, evidently, as disclosed in the record, *the Court and all the interested attorneys were advised before any motion for severance was made that Johnny Moore and Julia Moore would enter pleas of guilty.* That statement is made because Mr. Rogers, of counsel for the appellant, said: "I want to enter a protest against any pleas being taken in this case until after the principal is tried." Right after this statement of Mr. Rogers, appearing in the record, there is the following: "Note: This remark was occasioned by the fact that the Solicitor called Johnny Moore and Julia Moore to come around and sign their pleas." The Court said that the defendants could plead before they go to trial. Mr. Rogers said they had already been arraigned and pleaded not guilty. The Judge said the defendants could withdraw that plea. After a statement on the part of Mr. Rogers to the effect that such course would be unfair to his client, the appellant, Mr. Ellerbe, of counsel for the appellant, then said, "We will ask for a severance." From that moment on much was said, on the part of the Court and the counsel, with reference to the pleas of guilty already interposed, or to be interposed, on the part of Johnny Moore and Julia Moore, and with reference to the motion for a severeance, but we do not find in the record anything to show clearly whether or not the pleas of guilty by those two defendants were entered before or after the statement of Mr. Ellerbe that a severance was asked, with the exception of one statement on the part of the Court, coming after the announcement by Mr. Ellerbe, in the following language, "I will accept their pleas at this time, otherwise I will have to go on and try them." After that

announcement, Mr. Rogers did clearly move the Court to "sever the trial of these defendants, that is, sever Hilton Williams from all of the others, and try him and him alone."

While it may appear from some of the language of our opinion, set forth in the petition for rehearing, and hereinbefore quoted, that we only considered the motion of Mr. Rogers *last mentioned*, it was the intention of the Court to pass generally upon the right of the appellant to a severance of his trial from a trial of any and all of his codefendants, and a careful reading of what we said on the question of severance will, we think, so disclose.

In the beginning of our consideration of the exceptions as to the refusal of the Court to grant the severance, we said: "In the first question submitted, complaint is made that the presiding Judge committed error and abused his discretion in his refusal to grant a severance in the case, so that the appellant could be tried separately from his codefendants, charged with being accessories after the fact, who were allowed to change their pleas of not guilty to guilty pleas by agreement between the Solicitor and counsel appointed by the Court to represent those defendants, *all of which happened about the time of the commencement of the* trial and in the presence of the *jurors drawn to hear the case.*" (Emphasis added.)

Again, touching the possible position that the appellant complained of the refusal to grant him a severance from Scott and Coachman, we said: "So we pass also on that particular question." Concluding what we had to say as to the matter of severance, we stated, *"Taking all the circumstances into full consideration, we are unable to find any error in the refusal to grant any motion for severance that was offered."* (Italics added.)

In relating what we gathered were the facts of the occurrences in the lower Court as to the motion for severance, we did say: "We understand * * * until these two defendants [the Moores] had withdrawn their former pleas

and entered their last pleas of guilt, there was no motion on the part of the appellant  *  *  *  for a severance." But our holding that there was no error on the part of the trial Judge in his refusal to grant *any motion for severance* was not based upon *the time when any such motion was made.* An examination of all that was said as to the requested severance will show that we based our holding thereon upon these things:

1. The entry of the *nolle prosequi* on the indictment as to Newton eliminated him as a defendant in the case, and resulted in the severance of the trial of the appellant, so far as Newton was concerned.

2. That the pleas of guilty on the part of Johnny Moore and Julia Moore made it unnecessary to try those two defendants, and that accomplished a severance of any trial of the appellant from any trial of those two defendants.

3. That if the appellant desired a severance in the trial as to his codefendants Scott and Coachman, and a motion therefor was made, and if error was alleged on that account (which appeared doubtful to us), the action of the Court in refusing such requested severance was not prejudicial to the appellant, since it was not shown that there was any conflict as to the interest of the appellant and the interest of those two of his codefendants.

4. That the granting or refusing of a severance lies within the discretion of the trial Judge, and we found no abuse of that discretion.

Since the appellant, in his serious condition, is entitled at the hands of this Court to an earnest and careful consideration of any and all possible legal error in his trial, about which he complains, we will accept the view of his counsel *that a motion for severance was made before the pleas of guilty of Johnny Moore and Julia Moore were entered.* We have considered the contention that there was error in the refusal to grant the motion for severance, because the motion was made before, and not after, the pleas of guilty had

been entered. But we are still unable to find any error on the part of the trial Judge in refusing such motion; and what we have already said as to the motion for severance, and the reasons formerly given for such holding, answers the position of the appellant.

Regardless of when the motion for severance was made, *the appellant was not tried with Johnny Moore and Julia Moore. Those two defendants were not tried at all. They were used as witnesses for the State.*

After going over the record again, we are absolutely unable to see how the appellant could complain because he was tried along with his codefendants Scott and Coachman. We think the reasons for this view have already been sufficiently set forth.

The real complaint of the appellant now, as originally made, is not so much, it seems to us, with regard to the motion for severance, but to the action of the Court in permitting Johnny Moore and Julia Moore to plead guilty to the crime of accessory after the fact in the presence of the jurors, who would be called upon to try the appellant for the crime of murder. The argument is that the pleas of guilty on the part of those two defendants necessarily implied that the appellant was guilty of the murder alleged against him. We went fully, in the first opinion, into that matter. The defendants Johnny Moore and Julia Moore had the right, under the law, to plead guilty to the charge against them. The only place in which that plea could be made was in open Court. If those two defendants had not entered their pleas of guilty at the particular time they were entered, but had awaited to enter such pleas after the conclusion of appellant's trial, we fail to see wherein such action would have proven beneficial to the appellant. For, as said before, these two defendants were witnesses in the case for the State, they were cross examined at length by the appellant, and all they had to say about the homicide, and the matters occurring thereafter and their connection therewith,

were heard by the jury. That testimony must have had more effect on the jury than any possible formal plea of guilty could have had.

Naturally, as human beings, for sympathetic reasons, we would like to grant the very earnest prayer of appellant's counsel for a rehearing in the cause, looking to the probability, or even the possibility, of giving the appellant another chance in the lower Court. The eloquent arguments, oral and written, to this Court by counsel for the appellant, based' upon the severity of the sentence imposed upon the appellant, a negro, for the slaying of a white man at a negro bawdyhouse, have appealed strongly to us. But it has been said for a hundred years that this Court is "for the correction of errors of law only" in criminal cases. In our system of jurisprudence, in a case of this character, the verdict of the jury, and the sentence thereon, is not a matter for us. We are not intrusted, under the law, with the dispensation of mercy.

Another careful, thorough, and painstaking consideration of the entire record in the case, in connection with the petition for rehearing, has again convinced us that there was no legal error committed in the appellant's trial. Under the law, it is our duty, therefore, to affirm the judgment of the lower Court, and, accordingly, the petition for rehearing is dismissed.

MR. CHIEF JUSTICE BLEASE and MESSRS. JUSTICES STABLER, CARTER and BONHAM concur.