23403

The STATE, Respondent v. Michael R. TORRENCE, Appellant.
(406 S.E. (2d) 315)

Supreme Court

*Chief Atty. David I. Bruck*, and *Deputy Chief Atty. Elizabeth C. Fullwood* of *South Carolina Office of Appellate Defense*, Columbia, *for appellant.*

*Attorney Gen. T. Travis Medlock, Asst. Attys. Gen. Harold M. Coombs, Jr.*, and *William Edgar Salter, III*, Columbia, and *Sol. Donald V. Myers*, Lexington, *for respondent.*

*Charles M. Condon*, Charleston, *amicus curiae for South Carolina Solicitors Ass'n.*

*Morris D. Rosen,* Charleston, *amicus curiae for South Carolina Trial Lawyers Ass'n.*

*David I. Bruck,* Columbia, *amicus curiae for South Carolina Public Defenders Ass'n.*

*John H. Blume,* Columbia, *amicus curiae for South Carolina Death Penalty Resource Center, Inc.*

Heard May 1, 1989; Decided May 20, 1991.

Rehearing Denied July 24, 1991.

FINNEY, Justice:

Appellant Michael R. Torrence was convicted of armed robbery, burglary and the murders of Charlie Bush and Dennis Lollis. He received a sentence of life imprisonment for the murder of Charlie Bush and a sentence of death for the murder of Dennis Lollis. This appeal combines appellant's direct appeal and this Court's mandatory review of death penalty cases pursuant to S.C. Code Ann. § 16-3-25 (1985). We affirm the convictions and sentence of life imprisonment, reverse the death sentence, and remand for a new sentencing proceeding.

At the time of trial, appellant had previously been convicted in Charleston County for the murder of Cynthia Williams and sentenced to life imprisonment.

Appellant contends the trial court erred during the penalty phase of trial. Questions presented for review include the following:

    I. Did the court err by limiting testimony from appellant's mother?

    I. Did the court err when it did not instruct the jury as to the voluntariness of appellant's statements?

    III. Did the court err by refusing appellant's requested instruction regarding parole eligibility?

## I. MOTHER'S TESTIMONY

As part of appellant's case in mitigation his mother, Maria Torrence, was called as a witness. Mrs. Torrence testified that when the appellant was around twelve years old, she divorced appellant's father and was awarded custody of her four children. Mrs. Torrence further testified that she still loved

her son and was sorry for what he had done. She went on to explain that appellant began to have emotional problems after the divorce.

Thereafter, the following exchange took place:

Q. Do you have a basis for asking this jury to spare your son's life?

MR. MYERS: Objection, Your Honor.

MR. McWHIRTER: Your Honor, I have—

MR. MYERS: It's not proper, Your Honor. This is the defendant, not this poor lady here.

MR. McWHIRTER: Your Honor, I have a case—

WITNESS: That's my son. I don't want him to die.

MR. MYERS: Your Honor, I interpose an objection.

THE COURT: Mr. McWhirter, you know what the purpose of this proceeding is.

MR. McWHIRTER: Your Honor, I can get a case, if you will let me, that says the (sic) a mother can beg for the life of her son.

THE COURT: Well, I am going to instruct you now to tell this jury, or let this witness or any other witness tell the jury something about this young man which will help them assess him and not the mama who would naturally be terribly upset about her son being in this situation.

After the above exchange, Mrs. Torrence concluded her testimony by explaining that appellant has needed help with emotional problems for a number of years, but she was never able to afford it. When asked if she cared whether appellant ever got out of prison, Mrs. Torrence stated "I just want someone to help him."

Appellant contends the trial court erred by ruling that Mrs. Torrence could not appeal to the jury for mercy. The state, on the other hand, asserts that the line of questioning improperly went to the ultimate issue to be decided by the jury—whether to impose a life sentence or death. *See State v. Adams*, 277 S.C. 115, 283 S.E. (2d) 582 (1981).

In *Childs v. State*, 257 Ga. 243, 357 S.E. (2d) 48 (1987), the Supreme Court of Georgia illustrated the distinction between a plea for mercy and the ultimate question in the following terms:

[A]lthough a defendant may present witnesses who know and care for him and are willing on that basis to ask for mercy on his behalf, a defendant may not present witnesses to testify merely to their religious or philosophical attitudes about the death penalty. . . . Nor is a defendant entitled to present the opinion of a witness about what verdict the jury "ought" to reach.

*Id.* 357 S.E. (2d) at 60 (citation omitted). We find this distinction persuasive and herein adopt its reasoning.

In the present case, appellant sought only to have Mrs. Torrence make a general plea for mercy for the life of her son. He did not seek to elicit testimony about what verdict the witness thought should be imposed, as was the case in *State v. Matthews*, 296 S.C. 379, 373 S.E. (2d) 587 (1988). Thus, the line of questioning was not addressed to the ultimate issue. Despite the trial court's ruling which limited her testimony, Mrs. Torrence pleaded for mercy and appellant has shown no prejudice. *See State v. Matthews, supra.* Therefore, we conclude that the appellant has failed to demonstrate that he was prejudiced by the trial judge's ruling. This issue is addressed only to clarify the law should the question arise on retrial.

## II. JURY INSTRUCTION/VOLUNTARINESS OF STATEMENTS

Appellant contends the trial court erred by failing to charge the jury at the close of the penalty phase that it must find that the appellant's confessions were voluntarily given and accompanied by a waiver of his constitutional rights. This issue was not preserved via a contemporaneous objection at trial. The state contends that this Court should not employ the *in favorem vitae* doctrine to reach this issue. *In favorem vitae*, which literally means "in favor of life," is a doctrine which has been adhered to by this Court for more than one hundred years. The state petitioned this Court to abolish or modify the doctrine so as to prohibit review of issues in capital cases which have not been preserved by contemporaneous objections, asserting:

1. That historical and legal developments have rendered *in favorem vitae* obsolete;

2. That the contemporaneous objection rule serves and promotes justice and judicial economy; and

3. That post-conviction remedies and improved procedures adequately and efficiently protect an accused from possible abuses or errors.

We find utilization of the doctrine of *in favorem vitae* unnecessary to a resolution of this case and decline to address its abolition or modification. However, we shall address the asserted error since it may recur during retrial.

This Court has never held that a jury must determine the voluntariness of a defendant's statement during the *penalty* phase of trial. However, in *State v. Adams*, *supra*, with regard to jury consideration of a defendant's disputed statement upon conclusion of the guilt phase, this Court stated: *"[N]o confession may be considered by [the jury] unless found beyond reasonable doubt to have been given freely and voluntarily under the totality of the circumstances."* *Id.*, citing *State v. Harris*, 212 S.C. 124, 46 S.E. (2d) 682 (1948), *rev'd on other grounds*, 338 U.S. 68, 69 S. Ct. 1354, 93 L. Ed. 1815 (1949). In addition, when the defendant is in custody at the time of the alleged confession, the jury must be convinced that he received and understood his Fifth and Sixth Amendment rights. *State v. Adams*, *supra*. In our view, the same rule should apply when a capital defendant's disputed statement is introduced initially during the penalty phase. Thus, during sentencing proceedings held subsequent to filing of this opinion, the jury should be instructed to determine the voluntariness of a defendant's disputed statement when a jury has not previously made this determination. In such cases, the jury should be instructed that they must find beyond reasonable doubt that the statement was freely and voluntarily given under the totality of the circumstances before the statement may be considered. Additionally, the jury should be instructed that they must be convinced that the appellant received and understood his Fifth and Sixth Amendment rights if the alleged confession was given while the appellant was in custody.

### III. JURY CHARGE ON PAROLE ELIGIBILITY

Prior to penalty phase closing arguments, defense counsel requested a charge that because appellant was already

serving a life sentence for a previous unrelated murder conviction, imposition of a life sentence in this case would require service of both the prior and subsequent sentences without possibility of parole as mandated by S.C. Code Ann. § 24-21-640 (1976 & Supp. 1987). The Court declined to give this charge but told counsel that it would, upon request, charge the jury as to parole eligibility under S.C. Code Ann. § 16-3-20 (1976). Thus, defense counsel requested that section 16-3-20 be charged and the jury was instructed accordingly.

Jury instructions regarding parole eligibility based upon section 16-3-20 were authorized by this Court in *State v. Atkins*, 293 S.C. 294, 360 S.E. (2d) 302 (1987). Now, if requested by a capital defendant, the court may, in lieu of a charge that "life imprisonment is to be understood in its plain and ordinary meaning," charge the jury regarding possible sentences and parole eligibility as outlined in section 16-3-20.

The parole eligibility of a defendant convicted for murder is not solely governed by section 16-3-20. The General Assembly has imposed further restrictions on parole eligibility pursuant to S.C. Code Ann. §§ 24-21-610 to -650 (1976 and Supp. 1987).

In the present case, defense counsel requested a charge based upon section 24-21-640. This section states:

> The [Parole and Community Corrections Board] shall not grant parole nor is parole authorized to any prisoner serving a sentence for a second or subsequent conviction, following a separate sentencing for a prior conviction, for violent crimes as defined in § 16-1-60.[1]

Under section 24-21-640, a prisoner serving a life sentence for murder who has, as does appellant, a previous conviction for a violent crime would be ineligible for parole. Appellant alleges it was error to refuse the requested instruction and that the charge actually given was an inaccurate statement of his parole eligibility. On the other hand, the state contends that *State v. Matthews* supports the trial court's denial of the request to charge the law set forth in section 24-21-640. We disagree.

---

[1] S.C. Code Ann. § 16-1-60 (1976) classifies murder as a violent crime.

In *Matthews*, the jury instruction in issue was controlled by section 16-3-20 prior to its amendment in 1986. The 1986 amendment of section 16-3-20 established specific guidelines for sentencing and parole eligibility based upon the existence or non-existence of aggravating circumstances. The defendant in *Matthews* sought to waive the prohibition against *ex post facto* application of the 1986 amendment. A grant of waiver would have permitted the charge as authorized by *Atkins*. This Court rejected the defendant's request, concluding that the effect of such a waiver "would be to fashion a requirement of compliance with a defendant's decision as to the appropriate potential sentences regardless of the sentencing scheme enacted by the Legislature." *Matthews*, 373 S.E. (2d) at 592. *Matthews* is distinguishable from the present case. In *Matthews*, the defendant sought to have the court *alter* the law to gain a potential sentencing advantage. Here, appellant sought only to have the court declare correct and current law relevant to his case. Moreover, as applied to facts of the present case, the *Atkins* charge was an incorrect statement of appellant's parole eligibility had another life sentence been imposed. *See State v. Adams, supra;* S.C. Const. Art. V, § 21 (law declared must be current and correct). The state introduced evidence that appellant had previously pled guilty to an unrelated murder and received a life sentence. The requested charge was a correct statement of law which would have provided the jury with accurate information regarding appellant's parole eligibility.

We conclude that the trial court committed prejudicial error in denying appellant's request to charge based upon section 24-21-640, in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article V, § 21, of the South Carolina Constitution. This Court finds appellant's remaining exceptions to be without merit and declines to address them.

Accordingly, appellant's convictions and sentence of life imprisonment are affirmed. We reverse appellant's death sentence and remand for a new sentencing proceeding.

Affirmed in part, reversed in part and remanded.

GREGORY, C.J., and HARWELL, J., concur in result in separate opinion of CHANDLER and TOAL, JJ.

CHANDLER, J., concurs in result in separate opinion.

TOAL, J., concurs in result in separate opinion.

FINNEY, J., dissents to concurring opinion of TOAL, J.

CHANDLER, Justice (concurring in result):

I agree with the conclusion in Part III that the charge ■ outlined in *State v. Atkins*, 293 S.C. 294, 360 S.E. (2d) 302 (1987) does not accurately reflect the parole ineligibility of this defendant, should he receive a life sentence. *Cf. Caldwell v. Mississippi*, 472 U.S. 320, 336, 105 S. Ct. 2633, 2643, 86 L. Ed. (2d) 231, 243-44 (1985). I write separately because I believe we should reconsider *Atkins* and reinstate earlier precedent prohibiting capital sentencing juries from being informed about parole.

For forty years prior to *Atkins* this Court's decisions consistently disapproved the practice of placing the subject of parole before the jury in a death penalty case.

In *State v. Hinton*, 210 S.C. 480, 43 S.E. (2d) 360 (1947), capital convictions were reversed, in part, upon the solicitor's closing argument to the effect "that if the defendants were found guilty of murder, but recommended to life imprisonment, that this would not necessarily mean . . . they would serve a life sentence." *Id.* at 488, 43 S.E. (2d) at 363. We could find no justification for such argument, which suggested to the jury that a verdict of death "should be rendered because some other department of the state government might shorten or commute a life sentence." *Id.*

More than twenty years later, *State v. Atkinson*, 253 S.C. 531, 172 S.E. (2d) 111 (1970) addressed the appropriate response to a capital jury's question about the possibility of pardon or parole in the event of a life sentence.[2] We adopted "[t]he prevailing view . . . that a jury charged with the responsibility of assessing the penalty to be suffered by an accused should not be invited, by instruction or argument, to

---

[2] In *State v. Morris*, 243 S.C. 225, 133 S.E. (2d) 744 (1963), the issue was mentioned but not decided since the jury's question was not viewed as seeking information regarding the possibility of parole. The Court did state, however, that "[h]ad the [trial] court . . . given the jury information as to the possibility of parole, it could well be argued that the court erred in doing so to the prejudice of [the defendant]." *Id.* at 232, 133 S.E. (2d) at 747.

speculate on the possible effect of pardon or parole upon the execution of the sentence imposed." *Id.* at 534, 172 S.E. (2d) at 112. The rationale for this view was expressed as follows:

> 'The Legislature committed to the jury the responsibility to determine in the first instance whether punishment should be life or death. It charged another agency with the responsibility of deciding how a life sentence shall be executed. The jurors perform their task completely when they decide the matter assigned to them upon the evidence before them. What happens thereafter is no concern of theirs. . . .' ·

*Id.* at 535, 172 S.E. (2d) at 112 [quoting *State v. White*, 27 N.J. 158, 177-78, 142 A. (2d) 65, 76 (1958)].[3]

The holding in *Atkinson* served as a basis for numerous decisions concerning the introduction of parole into the sentencing phase of the bifurcated trial provided under our present death penalty law.[4] All these decisions unequivocally state that parole is not a proper consideration for capital sentencing juries.

In *State v. Goolsby*, 275 S.C. 110, 268 S.E. (2d) 31 (1980), we held that the trial court's charge to the jury erroneously included reference to parole eligibility. The error was cured, however, by further instruction that the jury was to determine sentence without regard to parole. *See* also *State v. Plath*, 277 S.C. 126, 284 S.E. (2d) 221 (1981) (curing reference to parole by codefendant's counsel).[5]

---

[3] *See also State v. Plath*, 281 S.C. 1, 15, 313 S.E. (2d) 619, 627 (1984), decided under the current death penalty statute:

> Such determinations as the time, place, manner, and conditions of execution or incarceration, as well as the matter of parole are reserved by statute and our cases to agencies other than the jury. As we have repeatedly stated, the sole function of the jury in a capital sentencing trial is the individualized selection of one or the other penalty, based upon the circumstances of the crime and characteristics of the individual defendant.

[4] In the interim, this Court held in *State v. Brooks*, 271 S.C. 355, 247 S.E. (2d) 436 (1978) that in determining guilt or innocence the jury must not be instructed regarding parole eligibility.

[5] In *State v. Drayton*, 293 S.C. 417, 361 S.E. (2d) 329 (1987), we held that a curative instruction for the jury not to consider parole was unnecessary since the reference to parole was in the context of the defendant's commission of prior crimes, not to its possibility in the event of a life sentence on the crime charged. *See also State v. Middleton*, 295 S.C. 318, 368 S.E. (2d) 457 (1988).

Other decisions went further, holding that, in the absence of the jury's inquiry, the defendant was not entitled to a charge prohibiting the jury from considering parole eligibility in making its sentencing determination. *State v. Butler*, 277 S.C. 543, 290 S.E. (2d) 420 (1982); *State v. Copeland*, 278 S.C. 572, 300 S.E. (2d) 63 (1982); *State v. South*, 285 S.C. 529, 331 S.E. (2d) 775 (1985). In *Copeland, supra,* we explained:

> The jurors were instructed to base their decisions solely upon the evidence adduced at trial and the law as instructed by the trial judge. While it is true that possibility of parole should not be considered by the jury, it is not the duty of the trial court to anticipate or speculate that jurors might consider it in their deliberations and instruct them accordingly. To do so may, in fact, inject consideration of parole into their deliberations where it may not before have been.

278 S.C. at 585, 300 S.E. (2d) at 71.

Finally, *State v. Norris*, 285 S.C. 86, 328 S.E. (2d) 339 (1985) set out the proper response to jurors' inquiry about parole eligibility:

> When the issue is raised, the Court should instruct the jury that it shall not consider parole eligibility in reaching its decision, and that the terms "life imprisonment" and "death sentence" should be understood in their ordinary and plain meaning.

*Id.* at 95, 328 S.E. (2d) at 344 (citation omitted). *See also State v. Peterson*, 287 S.C. 244, 335 S.E. (2d) 800 (1985); *State v. Johnson*, 293 S.C. 321, 360 S.E. (2d) 317 (1987); *State v. Plemmons*, 296 S.C. 76, 370 S.E. (2d) 871 (1988); *State v. Smith*, 298 S.C. 482, 381 S.E. (2d) 724 (1989) (omission of "no concern" language harmless error).

In *Atkins*, this Court followed established precedent, holding the defendant's request for instructions on parole eligibility was properly refused. Without discussion, the Court proceeded to set out the following guidelines, to be applied prospectively:

> In all death penalty cases which proceed to trial after this opinion is published, *if requested by the defendant,* the

trial judge shall charge the jury that the term "life imprisonment" is to be understood in its ordinary and plain meaning.

In death penalty cases controlled by the Omnibus Criminal Justice Improvements Act of 1986, 1986 S.C. Acts 2955, which proceed to trial after this opinion is published, *if the defendant so requests*, he may have the following charge given *in lieu* of the "life imprisonment is to be understood in its plain and ordinary meaning" charge:

> A person who is convicted of murder must be punished by death or by imprisonment for life. When the state seeks the death penalty and a statutory aggravating circumstance is specifically found beyond a reasonable doubt, and a recommendation of death is not made, the trial court must impose a sentence of life imprisonment without eligibility for parole until the service of thirty years. When a statutory aggravating circumstance is not found beyond a reasonable doubt, the defendant shall be sentenced to life imprisonment and he shall not be eligible for parole until the service of twenty years. No person sentenced under either of the sentencing schemes just explained may receive any work-release credits, good-time credits, or any other credit that would reduce the mandatory imprisonment.

293 S.C. at 300, 360 S.E. (2d) at 305-306. (Emphasis in original).

These instructions are incompatible not only with the rationale of the substantial body of law preceding *Atkins*, but also with that of our decisions which followed.

In *State v. Matthews*, 296 S.C. 379, 373 S.E. (2d) 587 (1988), this Court held that the trial court properly refused the defendant's *ex post facto* application of increased time for parole eligibility. *See also State v. Jones*, 298 S.C. 118, 378 S.E. (2d) 594 (1989); *State v. Smith, supra*. We specifically rejected the notion that "the punishment for a crime can serve as a mitigating sentencing consideration." *Matthews, supra*, at 386, 373 S.E. (2d) at 592. We stated:

That appellant would serve ten additional years before parole eligibility provides no evidence from which "the jury could have drawn favorable inferences . . . regarding [his] character and his probable future conduct if sentenced to life in prison." *Skipper v. South Carolina,* 476 U.S. 1, 4, 106 S. Ct. 1669, 1671, 90 L. Ed. (2d) 1, 6 (1986). The judge's refusal to apply the amendment here and instruct the jury on parole eligibility in no way "impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender." *Id.* at 8, 106 S. Ct. at 1673, 90 L. Ed. (2d) at 9.

*Id.* 296 S.C. at 386-87, 373 S.E. (2d) at 592.

Similarly, *State v. Patterson,* 299 S.C. 280, 384 S.E. (2d) 699 (1989) held that "information regarding requirements for parole eligibility is not mitigating evidence and is irrelevant to a defendant's adaptability to prison life." *Id.* at 286, 384 S.E. (2d) at 703. There, we also noted that "whether a jury is given information regarding reduction of a . . . sentence by commutation, pardon, or parole is a matter of state law." *Id.* [citing *California v. Ramos,* 463 U.S. 992, 103 S. Ct. 3446, 77 L. Ed. (2d) 1171 (1983)].[6]

These two recent decisions reaffirm the principle, uniformly followed prior to *Atkins,* that parole is irrelevant to the determination of a capital sentence. Thus, they support the conclusion that parole should at no time enter into the jury's deliberations.

Aside from this logical inconsistency, the *Atkins* instructions present practical problems in their application.

---

[6] *Matthews and Patterson* are in accord with the weight of authority. Two courts have specifically rejected parole ineligibility as mitigating evidence. *King v. Dugger,* 555 So. (2d) 355 (Fla. 1990); *State v. Clark,* 108 N.M. 288, 772 P. (2d) 322 (1989). Other courts have generally upheld the constitutionality of prohibiting parole as a sentencing consideration. *Peterson v. Murray,* 904 F. (2d) 882 (4th Cir. 1990); *Turner v. Bass,* 753 F. (2d) 342 (4th Cir. 1985), *rev'd on other grounds sub nom. Turner v. Murray,* 476 U.S. 28, 106 S. Ct. 1683, 90 L. Ed. (2d) 27 (1986); *Andrade v. McCotter,* 805 F. (2d) 1190 (5th Cir. 1986); *O'Bryan v. Estelle,* 714 F. (2d) 365 (5th Cir. 1983); *Johnson v. Thigpen,* 623 F. Supp. 1121 (S.D. Miss. 1985), *aff'd,* 806 F. (2d) 1243 (5th Cir. 1986); *Kirkpatrick v. Blackburn,* 597 F. Supp. 1562 (E.D. La. 1984), *vacated in part on other grounds,* 777 F. (2d) 272 (5th Cir. 1985); *State v. Robbins,* 319 N.C. 465, 356 S.E. (2d) 279 (1987).

The trial court is, in effect, required to rule upon a particular defendant's eligibility for parole before sentence has even been imposed. This determination may involve novel issues of law[7] or statutory provisions which have not been interpreted.[8] Moreover, there is no way to be assured that the Parole Board would reach the same conclusion as the court.

For all of the stated reasons, I would overrule *Atkins* to the extent it permits the introduction of parole into the capital sentencing decision.

GREGORY, C.J., and HARWELL and TOAL, JJ., concur.

TOAL, Justice (concurring in result and joining Justice CHANDLER's concurrence in result):

I join my brother Chandler's concurrence in result *in toto*. I too would overrule *State v. Atkins*, 293 S.C. 294, 360 S.E. (2d) 302 (1987). However, I write separately for the majority of this Court for the purpose of expressing our abolition of the outdated doctrine of *in favorem vitae*.[9] This doctrine served a useful function for many years, but today, in light of advances in the quality of legal representation; in light of the many protections and avenues of relief available to criminal defendants; and in light of the modern day restricted use of capital punishment post *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. (2d) 346 (1972), the doctrine has become counterproductive to the administration of justice in some instances.[10]

This Court first recognized the doctrine of *in favorem vitae* nearly two hundred years ago. *State v. Briggs*, 3 S.C.L. 8 (1 Brev.) (1794). This doctrine requires this Court to review the entire record for legal error, and assume error when

---

[7] For example, in the *Atkins* resentencing the trial court was faced with deciding the effect of consecutive life sentences on parole eligibility. *See State v. Atkins*, 399 S.E. (2d) 760 (S.C. 1990).

[87] The statute involved in this case is not entirely clear. It provides in pertinent part that "[t]he Board shall not grant parole nor is parole authorized to any prisoner serving a sentence for a second or subsequent conviction, following a separate sentencing for a prior conviction, for violent crimes as defined in § 16-1-60." S.C. Code Ann. § 24-21-640 (1989).

[9] Meaning literally "in favor of life."

[10] We address the question of whether to abolish the *in favorem vitae* doctrine since Torrence's "Argument IV" could *only* be considered by this Court via the *in favorem vitae* vehicle.

unobjected-to but technically improper arguments, evidence, jury charges, *etc.* are asserted by the defendant on appeal in a demand for reversal or a new trial. This Court has indicated since the doctrine's inception that the doctrine is to be used sparingly. In *State v. Fley*, 4 S.C.L. 338, 345 (2 Brev.) (1809) we stated:

> In favor of life, great strictness has been required in indictments. Courts have indeed leaned too much in favor of exceptions to them, which has sometimes proved very prejudicial to public justice, and a reproach to the law. This proneness to favor exceptions in favor of life ought not to be indulged in too far.

Since *Fley*, we have long recognized the doctrine could be abused in a given case and serve to work an *injustice*, which the doctrine was created specifically to prevent. Nevertheless, we have retained the doctrine until today because of its once important utilitarian value in certain cases in halting an unjust execution or reversing an erroneous conviction. Other mechanisms of protection and of relief have now been created for the criminal defendant which safeguard the defendant and render the protections afforded by *in favorem vitae* surplusage.

We now remedy this situation by letting the doctrine take its place in history as a once-useful device necessary to an old culture that desperately needed some form of protection against unfair convictions and sentences. As stated by United States Supreme Court Justice Oliver Wendell Holmes:

> It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.

Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457, 469 (1897).

When *in favorem vitae* was adopted by this Court, there were numerous crimes for which one could be executed. Sometime shortly after 1800, the total number of capital offenses in England exceeded two hundred. *Furman v. Georgia*, 408 U.S. 238, 314, 92 S. Ct. 2726, 2765, 33 L. Ed. (2d)

346 (1972) (Marshall, J. concurring). While this plethora of capital offenses did not exist in the colonies, capital punishment was imposed for a wide variety of crimes, not just for murder. *See Furman, supra,* (Marshall, J. concurring). At the time *in favorem vitae* was adopted, state post-conviction relief did not exist. Few would argue with the proposition that post-conviction relief of any meaningful kind was not available in the late eighteenth century and early nineteenth century. State courts thus took action to alleviate what could easily in such times be an unjust conviction or sentence. The Supreme Court of Ohio observed, in 1877,

> [t]he fact is unquestioned that there was a time when felonies, which at common law were few in number, embraced, by parliamentary enactments, more than 200 offenses; when acts were punishable with death, which, if committed in this State, at this day, would not be punishable at all; when one charged with felony was not permitted to have a copy of, or even to examine the indictment, to call witnesses in his defense, or to have the assistance of counsel; when no instance could be found in which a jury, in a criminal case, had failed to render a verdict on the same day it was impaneled; when jurors were fined for refusing to return a verdict of guilty; when the ordinary course was to sentence as soon as a verdict of guilty was rendered, and cause the accused to be executed on the following morning. It is not strange that in such a State of the criminal law, humane judges, *in favorem vitae,* would determine cases upon technicalities which at this day would be regarded as frivolous.

*Burke v. Ohio,* 34 Ohio St. 79, 80 (1877).

Such a state of affairs obviously does not exist today. Former Chief Justice Littlejohn, in a *non-capital case,* noted for this Court:

> The courts of the states and of the United States give to a person accused of crime more protection against the possibility of erroneous conviction than many other system of courts on the face of the globe. The State must overcome many hurdles before an accused person is punished:

(1) the magistrate may refuse to issue a warrant;

(2) the magistrate may dismiss the case after a preliminary hearing;

(3) a grand jury may refuse to indict;

(4) the solicitor may direct a verdict;

(6) a petit jury may refuse to convict if only one juror has a reasonable doubt; .

(7) the judge may set the verdict aside notwithstanding a verdict of the jury;

(8) the appellate court may reverse the conviction.

If the accused person can prevail at any one of these stages of a proceeding, he goes free and is unpunished. On the other hand, the State must prevail at each of the eight stages before punishment is inflicted.

In addition to these many protections, the accused now has the right of application for post-conviction relief upon a proper showing. In almost any case a convicted person, given time for research, can come up with some sort of theory ostensibly warranting a new trial.

*Anderson v. Leeke,* 271 S.C. 435, 440-41, 248 S.E. (2d) 120, 122-23 (1978). Moreover, the post-conviction relief mechanism is not a minor one. South Carolina Code Ann. § 17-27-20 (1985), which provides the scope of the Uniform Post-conviction Procedure Act, reads:

(a) Any person who has been convicted of, or sentenced for, a crime and who claims:

(1) That the conviction or the sentence was in violation of the Constitution of the United States or the Constitution or laws of this State;

(2) That the court was without jurisdiction to impose sentence;

(3) That the sentence exceeds the maximum authorized by law;

(4) That there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice;

(5) That his sentence has expired, his probation, parole or conditional release unlawfully revoked, or he is

> otherwise unlawfully held in custody or other restraint; or
>
> (6) That the conviction or sentence is otherwise subject to collateral attack upon any ground of alleged error heretofore available under any common law, statutory or other writ, motion, petition, proceeding or remedy; may institute, without paying a filing fee, a proceeding under this chapter to secure relief. Provided, however, that this section shall not be construed to permit collateral attack on the ground that the evidence was insufficient to support a conviction.
>
> . . . .

Federal *habeas corpus* relief is also available to criminal defendants. The capital defendant, in addition, has other protections given him by statute. *See* S.C. Code Ann. § 16-3-20 *et seq.* (1976). For example, the death penalty may be inflicted only if one or more aggravating circumstances are found to exist beyond a reasonable doubt. Additionally, a capital defendant may request the Court, pursuant to S.C. Code Ann. § 16-3-25 (1976), to conduct a proportionality review of his sentence. In short, the modern criminal defendant in a capital case has available a variety of procedural and substantive protective devices with which to defend himself. The conviction of an innocent person is unlikely under our modern system; *most* unlikely relative to the time when *in favorem vitae* was adopted by this Court.

Therefore, the reasons and basis prompting adoption of the *in favorem vitae* doctrine no longer exist. However, the dangers associated with the doctrine and potential for abuse of the doctrine by the criminal defendant exist as long as the doctrine still has force. The primary danger associated with the doctrine is that a defendant will deliberately refrain from objecting to an error which occurs during trial. This is what is referred to by some as "sandbagging." Of course, a contemporaneous objection requirement to preserve legal errors operates to procedurally preclude a defendant from allowing error to occur at trial and then complaining of it on appeal. However, with *in favorem vitae* review, the appellate court searches the record for error without regard to whether

an objection has preserved it. This encourages defense attorneys to purposefully allow error to occur (such as improper solicitor argument or erroneous charge by the judge) in a case they feel they are losing at trial, thereby tainting the trial, while taking comfort that this Court will reverse a conviction based upon the unobjected-to error.

This strategy *may* serve in some cases to make more probable the conviction of a defendant at trial, but the defense attorney finds solace in an *in favorem vitae* appellate reversal and, possibly years later, a new trial with evidence or witnesses missing. Common sense dictates that a defense attorney is more likely to employ this sandbagging tactic when he feels his client will be convicted anyway. Indeed, the argument that it is a defense attorney's duty as an advocate to employ this tactic does not lack force. Hence, those defendants who are *least likely* to be innocent of the charges against them are those *most likely* to receive the benefit of the operation of *in favorem vitae* review, since it is those defendants who must employ "sandbagging" tactics and the like in an attempt to avoid punishment for their actions. This practice frustrates the goals of our criminal justice system—which is designed not only to protect the innocent but to punish the guilty.

Further, some attorneys may allow errors to occur as a matter of trial strategy. A defense attorney may, for example, desire that certain improper arguments by the State be heard by the jury, or that the jury be charged a certain erroneous charge. The defense attorney will thus allow the "error" to occur, based on the thinking that the introduction of the argument or charge into the case would *benefit* the client due to the nature of the case or the circumstances involved. Also, defense counsel may decide as a strategic matter not to object because his objection would highlight the erroneous evidence, argument, or charge. With *in favorem vitae* review, this Court merely assumes ineffectiveness in these instances,[11] having no

---

[11] It is true we have held that the doctrine of *in favorem vitae* is designed to allow this Court to review errors of law only, as opposed to strategy decisions of trial counsel. *State v. Riddle*, 291 S.C. 232, 353 S.E. (2d) 138 (1987). However, the fact remains that there are very few cases in which we can determine, based on the record before us, whether the failure by defense counsel to object was a strategic decision.

ability to question the parties involved to discover whether strategy was involved.

In situations where an objection is not made due to alleged ineffective assistance of defense counsel, we hold the more preferable method of exploring this issue is via the avenue of an application for post-conviction relief, rather than reversal of the underlying error by way of *in favorem vitae* review. It is in the context of an adversarial proceeding, such as in post-conviction relief, that a tribunal can make a truly well-informed judgment on whether defense counsel in a given instance was prejudically ineffective, or whether the failure to object was a part of trial strategy.

The purposeful failure to object because of the safety net provided by *in favorem vitae* also forces the trial judge to inject himself into certain situations in a quasi-adversarial role. The trial judge must, in order to avoid appellate reversal, do what is the defense counsel's job and prevent the State from making improper arguments and/or comments; from introducing improper evidence; or from asking improper questions. The trial judge is also put in a position at times of choosing to: (1) permit a defendant to strategically refrain from objecting and thereby benefit his client; or (2) refuse to allow the evidence in or argument to be made *ex mero motu* to prevent reversal by this Court on appeal via *in favorem vitae* review. This is a breakdown of the traditional adversarial process we can no longer sanction.

A contemporaneous objection requirement enables trial judges to make reasoned decisions by appropriately developing issues by way of argument, both for or against any particular legal proposition. This, in turn, allows potential errors to be prevented or cured. The United States Supreme Court set forth in *Wainwright v. Sykes*, 433 U.S. 72, 90, 97 S. Ct. 2497, 2508, 53 L. Ed. (2d) 594 (1977) the virtues of a contemporaneous objection requirement thusly:

> A defendant has been accused of a serious crime, and this is the time and place set for him to be tried by a jury of his peers and found either guilty or not guilty by that jury. To the greatest extent possible all issues which bear on this charge should be determined in this proceeding: the accused is in the courtroom, the jury is in the box, the

judge is on the bench, and the witnesses, having been subpoenaed and duly sworn, await their turn to testify. Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens. Any procedural rule which encourages the result that those proceedings be as free of error as possible is thoroughly desirable, and the contemporaneous objection rule surely falls within that classification.

As stated by the Court in *Wainwright,* the contemporaneous objection maintains the framework of our time-proven adversarial process and allows the various actors in each trial (solicitor, defense counsel, and trial judge) to adhere to their traditional roles.

Torrence argues that *in favorem vitae* review is mandated by statute despite the fact it was adopted by this Court on its own nearly two centuries ago. Torrence contends the legislature codified this review for capital defendants in S.C. Code Ann. § 16-3-25 (1988 Cum. Supp.). We disagree and do not interpret this statute as mandating *in favorem vitae* review. If the legislature had expressly mentioned the *in favorem vitae* doctrine, or if it had expressly required this Court to review and reverse convictions and/or sentences based on unobjected-to errors, we would think differently.

Torrence points specifically to § 16-3-25(B)'s language, which reads: "[t]he Supreme Court of South Carolina shall consider the punishment as well as any errors by way of appeal." Torrence argues this verbiage indicates this Court must consider his appellate arguments regardless of whether they are procedurally preserved by a contemporaneous objection. Torrence reads too much into too little. Simply because the legislature failed to mention the procedural requirements necessary to assign error does not mean that none exist. This Court's general appellate jurisdiction statute, S.C. Code Ann. § 14-3-330 (1976), states in terms similar to those used in § 16-3-25(B): "[t]he Supreme Court shall have appellate jurisdiction for correction of errors of law in law cases. . . ." To accept Torrence's interpretation of § 16-3-25(B) would mean by way of analogy that this Court would have to

review procedurally barred "errors of law" in all cases under § 14-3-330.

Torrence next focuses on the language of § 16-3-25(C), ▮ which concerns certain situations in which a death sentence must be reversed, *viz.*, (1) when it is the result of passion, prejudice, or any other arbitrary factor;[12] (2) when there is a lack of evidence supporting the trial judge's finding of a statutory aggravating circumstance; and (3) where the sentence is excessive or disproportionate to the penalty imposed in similar cases. Torrence argues this Court must address on appeal any argument under § 16-3-25(C) regardless of whether it is procedurally barred through the absence of a contemporaneous objection. He then contends the "arbitrary factor" language in the statute is a rubric under which virtually all legal errors fall, and that therefore *in favorem vitae* review of all legal errrors is required by § 16-3-25(C).

As an initial matter, the "arbitrary factor" language in the statute is not to be interpreted as broadly as Torrence urges. Were it to be so interpreted, the legislature would not have needed to include references to insufficient evidence of a statutory aggravating circumstance or to an excessive or disproportionate sentence. The legislature also would not have, in § 16-3-25(B), stated that this Court "shall consider . . . any errors by way of appeal," since the "arbitrary factor" term would, under Torrence's view, encompass all legal errors.

This aside, we have already, by implication, rejected Torrence's argument that somehow § 16-3-25(C) mandates *in favorem vitae* review. In *State v. Butler*, 277 S.C. 543, 290 S.E. (2d) 420 (1982), James Butler argued on appeal that his sentence should be vacated pursuant to § 16-3-25(C)(1) because a solicitor's personal opinion was injected into the jury's determinations. Under Torrence's view, § 16-3-25 itself would require us to review Butler's claim. We did not interpret the statute in such a way in *Butler*, however. There, Justice Harwell, writing for the court, stated:

---

[12] A finding of a sentence of death based on such would constitute an Eighth Amendment violation in any event.

> *Although no timely objection to the remarks was made at trial,* this Court will review the record *in favorem vitae* in a capital case. We conclude that the solicitor's jury arguments during the penalty phase require that appellant's sentence of death be vacated. When a solicitor's personal opinion is explicitly injected into the jury's determinations as though it were in itself evidence justifying a sentence of death, the resulting death sentence may not be free from the influence of any arbitrary factor as required by S.C. Code Ann. § 16-3-25(C)(1)....

(emphasis added) (citations omitted) 277 S.C. at 546, 290 S.E. (2d) at 421. In *Butler* we clearly reached the § 16-3-25(C) argument through the *in favorem vitae* mechanism. Absent that mechanism, the failure to object would have procedurally barred Butler's argument. In sum, we reject Torrence's argument that *in favorem vitae* review is statutorily required.

However, we do not relinquish entirely our ability to provide relief to those who have, for whatever reason, been utterly failed by our criminal justice system. While we abolish *in favorem vitae* review as an outdated doctrine too easily abused, an imprisoned individual may obtain a writ of *habeas corpus* from this Court after exhausting all other sources of relief, "where there has been a 'violation, which, *in the setting,* constitutes a denial of fundamental fairness shocking to the universal sense of justice.' " *Butler v. State,* — S.C. —, 397 S.E. (2d) 87 (1990) (emphasis in the original) (*quoting State v. Miller,* 16 N.J. Super. 251, 84 A. (2d) 459 (1951)). This said, we hold a contemporaneous objection is necessary in all trials beginning after the date of this opinion to properly preserve errors for our direct appellate review.[13]

GREGORY, C.J., and HARWELL and CHANDLER, JJ., concur.

---

[13] To the extent they require *in favorem vitae* review, the following cases, *inter alia,* are hereby overruled:

*State v. Arthur,* 296 S.C. 495, 374 S.E. (2d) 291 (1988);
*State v. Diddlemeyer,* 296 S.C. 235, 371 S.E. (2d) 793 (1988);
*State v. Hawkins,* 292 S.C. 418, 357 S.E. (2d) 10 (1987);
*State v. Bellamy,* 293 S.C. 103, 359 S.E. (2d) 63 (1987);
*State v. Reed,* 293 S.C. 515, 362 S.E. (2d) 13 (1987);
*State v. Riddle,* 291 S.C. 232, 353 S.E. (2d) 138 (1987);

*State v. Cooper,* 291 S.C. 332, 353 S.E. (2d) 441 (1986);

*State v. Pierce,* 289 S.C. 430, 346 S.E. (2d) 707 (1986);

*State v. Damon,* 285 S.C. 125, 328 S.E. (2d) 628 (1985); *cert. denied,* 474 U.S. 865, 106 S. Ct. 187, 88 L. Ed. (2d) 156, *reh. denied,* 474 U.S. 1015, 106 S. Ct. 551, 88 L. Ed. (2d) 479 (1985);

*State v. Drayton,* 287 S.C. 226, 337 S.E. (2d) 216 (1985);

*State v. Gaskins,* 284 S.C. 105, 326 S.E. (2d) 132 (1985), *cert. denied,* 471 U.S. 1120, 105 S. Ct. 2368, 86 L. Ed. (2d) 266 (1985);

*State v. Koon,* 285 S.C. 1, 328 S.E. (2d) 625 (1984), *cert. denied,* 471 U.S. 1036, 105 S. Ct. 2056, 85 L. Ed. (2d) 329 (1985);

*State v. Lucas,* 285 S.C. 37, 328 S.E. (2d) 63 (1985), *cert. denied,* 472 U.S. 1012, 105 S. Ct. 2714, 86 L. Ed. (2d) 729, *reh. denied,* 473 U.S. 925, 106 S. Ct. 15, 87 L. Ed. (2d) 694 (1985);

*State v. Norris,* 285 S.C. 86, 328 S.E. (2d) 339 (1985);

*State v. Peterson,* 287 S.C. 244, 335 S.E. (2d) 800 (1985);

*State v. Plemmons,* 286 S.C. 78, 332 S.E. (2d) 765 (1985), *vacated on other grounds,* 476 U.S. 1102, 106 S. Ct. 1943, 90 L. Ed. (2d) 353 (1986);

*State v. Singleton,* 284 S.C. 388, 326 S.E. (2d) 153 (1985), *cert. denied,* 471 U.S. 1111, 105 S. Ct. 2346, 85 L. Ed. (2d) 863 (1985);

*State v. Smith,* 286 S.C. 406, 334 S.E. (2d) 277 (1985), *cert. denied,* 475 U.S. 1031, 106 S. Ct. 1239, 89 L. Ed. (2d) 347;

*State v. Chaffee,* 285 S.C. 21, 328 S.E. (2d) 464 (1984), *cert. denied,* 471 U.S. 1009, 105 S. Ct. 1878, 85 L. Ed. (2d) 170 (1985);

*State v. Patterson,* 285 S.C. 5, 327 S.E. (2d) 650 (1984) (II), *cert. denied,* 471 U.S. 1036, 105 S. Ct. 2056, 85 L. Ed. (2d) 329 (1985);

*State v. Adams,* 279 S.C. 228, 306 S.E. (2d) 208 (1983) (II);

*State v. Elmore,* 279 S.C. 417, 308 S.E. (2d) 781 (1983) (I);

*State v. H. Butler,* 277 S.C. 452, 290 S.E. (2d) 1 (1982), *cert. denied,* 459 U.S. 932, 103 S. Ct. 242, 74 L. Ed. (2d) 191 (1982);

*State v. J.A. Butler,* 277 S.C. 543, 290 S.E. (2d) 420 (1982);

*State v. Patterson,* 278 S.C. 319, 295 S.E. (2d) 264 (1982) (I);

*State v. Smart,* 278 S.C. 515, 299 S.E. (2d) 686 (1982), *cert. denied,* 460 U.S. 1088, 103 S. Ct. 1784, 76 L. Ed. (2d) 353 (1983);

*State v. Thompson,* 278 S.C. 1, 292 S.E. (2d) 581 (1982), *cert. denied,* 456 U.S. 938, 102 S. Ct. 1996, 72 L. Ed. (2d) 458 (1982);

*State v. Yates,* 280 S.C. 29, 310 S.E. (2d) 805 (1982);

*State v. Adams,* 277 S.C. 115, 283 S.E. (2d) 582 (1981);

*State v. Hyman,* 276 S.C. 559, 281 S.E. (2d) 209 (1981), *cert. denied,* 458 U.S. 1122, 102 S. Ct. 3510, 73 L. Ed. (2d) 1384, *reh. denied,* 458 U.S. 1132, 103 S. Ct. 18, 73 L. Ed. (2d) 1403 (1982);

*State v. Woomer,* 276 S.C. 258, 277 S.E. (2d) 696 (1981);

*State v. Goolsby,* 275 S.C. 110, 268 S.E. (2d) 31 (1980), *cert. denied,* 449 U.S. 1037, 101 S. Ct. 616, 66 L. Ed. (2d) 500 (1980);

*State v. Gilbert,* 273 S.C. 690, 258 S.E. (2d) 890 (1979);

*State v. Shaw,* 273 S.C. 194, 255 S.E. (2d) 799 (1979), *cert. denied,* 444 U.S. 957, 100 S. Ct. 437, 62 L. Ed. (2d) 329 (1980);

*State v. A. Allen,* 266 S.C. 175, 222 S.E. (2d) 287 (1976);

*State v. J.L. Allen,* 266 S.C. 468, 224 S.E. (2d) 881 (1976);

*State v. Ingram,* 266 S.C. 462, 224 S.E. (2d) 711 (1976);

*State v. Atkinson,* 253 S.C. 531, 172 S.E. (2d) 111 (1970);

*State v. Bell,* 250 S.C. 37, 156 S.E. (2d) 313 (1967);

*State v. Gamble,* 249 S.C. 605, 155 S.E. (2d) 916 (1967);

*State v. Cannon,* 248 S.C. 506, 151 S.E. (2d) 752 (1966);

*State v. Gamble,* 247 S.C. 214, 146 S.E. (2d) 709 (1966);

*State v. Thomas,* 248 S.C. 573, 151 S.E. (2d) 855 (1966);

*State v. Cain,* 246 S.C. 536, 144 S.E. (2d) 905 (1965);

*State v. Swilling,* 246 S.C. 144, 142 S.E. (2d) 864 (1965), *cert. denied,* 389 U.S. 1055, 88 S. Ct. 806, 19 L. Ed. (2d) 853 (1968);

*State v. Black,* 243 S.C. 42, 132 S.E. (2d) 5 (1963);

*State v. Moorer,* 241 S.C. 487, 129 S.E. (2d) 330 (1963);

*State v. Morris,* 243 S.C. 225, 133 S.E. (2d) 744 (1963);

*State v. Sharpe,* 239 S.C. 258, 122 S.E. (2d) 622 (1962);

*State v. Worthy,* 239 S.C. 449, 123 S.E. (2d) 835 (1962);

*State v. Outen,* 237 S.C. 514, 118 S.E. (2d) 175 (1961);

*State v. Robinson,* 238 S.C. 140, 119 S.E. (2d) 671 (1961);

*State v. Thorne,* 239 S.C. 164, 121 S.E. (2d) 623 (1961);

*State v. Young,* 238 S.C. 115, 119 S.E. (2d) 504 (1961);

*State v. Britt,* 237 S.C. 293, 117 S.E. (2d) 379 (1960);

*State v. Johnson,* 236 S.C. 207, 113 S.E. (2d) 540 (1960);

*State v. Britt,* 235 S.C. 395, 111 S.E. (2d) 669 (1959);

*State v. Brooks,* 235 S.C. 344, 111 S.E. (2d) 686 (1959), *appeal dismissed,* 365 U.S. 300, 81 S. Ct. 707, 5 L. Ed. (2d) 689 (1961);

*State v. Bullock,* 235 S.C. 356, 111 S.E. (2d) 657 (1959);

*State v. Livingston,* 233 S.C. 400, 105 S.E. (2d) 73 (1958);

*State v. Daniels,* 231 S.C. 176, 97 S.E. (2d) 902 (1957);

*State v. Byrd,* 229 S.C. 593, 93 S.E. (2d) 900 (1956);

*State v. Jones,* 228 S.C. 484, 91 S.E. (2d) 1 (1956);

*State v. Boone,* 228 S.C. 438, 90 S.E. (2d) 640 (1955);

*State v. Chasteen,* 228 S.C. 88, 88 S.E. (2d) 880 (1955);

*State v. Green,* 227 S.C. 1, 86 S.E. (2d) 598 (1955);

*State v. Waitus,* 226 S.C. 44, 83 S.E. (2d) 629 (1954);

*State v. Gantt,* 223 S.C. 431, 76 S.E. (2d) 674 (1953), *cert. denied,* 347 U.S. 906, 74 S. Ct. 433, 98 L. Ed. 1065 (1954);

*State v. Blassingame,* 221 S.C. 169, 69 S.E. (2d) 601 (1952);

*State v. Harvey,* 220 S.C. 506, 68 S.E. (2d) 409 (1951);

*State v. Harris,* 212 S.C. 124, 46 S.E. (2d) 682 (1948);

*State v. Lincoln,* 213 S.C. 553, 50 S.E. (2d) 687 (1948);

*State v. Taylor,* 213 S.C. 330, 49 S.E. (2d) 289 (1948);

*State v. Gidron,* 211 S.C. 360, 45 S.E. (2d) 587 (1947);

*State v. Gatlin,* 208 S.C. 414, 38 S.E. (2d) 238 (1946);

*State v. Scott,* 209 S.C. 61, 38 S.E. (2d) 902 (1946);

*State v. Simmons,* 208 S.C. 538, 38 S.E. (2d) 705 (1946);

*State v. Grant,* 199 S.C. 412, 19 S.E. (2d) 638 (1942); *cert. denied,* 316 U.S. 662, 62 S. Ct. 942, 86 L. Ed. 1739 (1942);

*State v. Osborne,* 200 S.C. 504, 21 S.E. (2d) 178 (1942);

*State v. McDonald,* 184 S.C. 290, 192 S.E. 365 (1937);

*State v. Williams,* 166 S.C. 63, 164 S.E. 415 (1932). *See also, e.g., State v. Green,* 48 S.C. 136, 26 S.E. 234 (1897);

*State v. Faile,* 43 S.C. 52, 20 S.E. 798 (1895);

*State v. Morgan,* 40 S.C. 345, 18 S.E. 937 (1894); *In re State v. Turner,* 39 S.C. 414, 17 S.E. 888 (1893), *affirmed, State v. Turner,* 39 S.C. 420, 17 S.E. 885 (1893);

*State v. Levelle,* 34 S.C. 120, 13 S.E. 319 (1891);

*State v. Davis,* 27 S.C. 609, 4 S.E. 567 (1888);

*State v. McNinch,* 12 S.C. 89 (1879);

*State v. Fley,* 4 S.C.L. 338 (2 Brev.) (1809);

*State v. Arden,* 1 S.C.L. 487 (1 Bay) (1795);

*State v. Briggs,* 3 S.C.L. 8 (1 Brev.) (1794).

Finney, Justice, dissenting:

I respectfully dissent from the majority's concurring decision to abolish the doctrine of *in favorem vitae*. In my opinion, *in favorem vitae* review is a reasonable and decidedly modest precautionary measure when the state seeks to impose the sanction of death.

As I read the concurrence, the primary reasons advanced for abolishment of the doctrine of *in favorem vitae* are: 1) The availability of other mechanisms to capital defendants for detection and remedy of errors; and 2) abuse by defendants' trial counsel who deliberately refrain from interposing objections to trial errors in reliance upon the doctrine. I consider both reasons invalid grounds for abolishing the doctrine.

First, with regard to the availability of other procedural safeguards for capital defendants, none of these serve the specific function of *in favorem vitae*. The statutory provision for post-conviction relief was created to rectify prejudicial error in *any* criminal case, and is limited in its scope of review and application. On the other hand, the more expansive *in favorem vitae* review was created to address errors within the unique context of a capital trial. *State v. James Butler*, 277 S.C. 543, 290 S.E. (2d) 420 (1982).

As to the ability of capital defendants to obtain a writ of *habeas corpus*, this remedy is available only after exhausting all other avenues of relief and is limited to cases "where there has been a 'violation, which, *in the setting*, constitutes a denial of fundamental fairness shocking to the universal sense of justice.' " *Horace Butler v. State*, — S.C. —, 397 S.E. (2d) 87 (1990) (emphasis in the original), *cert. denied*, — U.S. —, 111 S. Ct. 442, 112 L. Ed. (2d) 425 (1990), *quoting State v. Miller*, 16 N.J. Super. 251, 84 A. (2d) 459 (1951). I would find the circumscription upon obtaining *habeas corpus*, though applicable to other criminal cases, unduly restrictive and inappropriate in a case where the imposition of death precludes subsequent remediation.

Second, concerning abuse of *in favorem vitae* by defendants' trial counsel who fail to object to trial errors in reliance upon the doctrine, so called "sandbagging," I am of the opinion that abolishment of the doctrine for this reason is a severe and

misdirected attempt to remedy a matter properly and more appropriately addressed through other mechanisms presently in place. I would point out that I find no allegation in this record nor citation in the concurrence of "sandbagging." However, such an assertion presumes bad faith on the part of defense counsel. I would suggest that where such is the case, the Rules of Professional Conduct provide remedies for attorney misconduct or abuse of the system. It is incomprehensible that a capital defendant should be penalized for the actions of his counsel when the ultimate result may be prejudicial error for which a defendant pays with his life.

The evolution of mechanisms of protection cited by the majority does not alter the fact that the trial of a capital case and the resulting punishment are inherently different from any other criminal prosecution. For almost 200 years, this Court has recognized the doctrine of *in favorem vitae* as a viable and necessary device for safeguarding the integrity of our criminal justice system by insuring that prejudicial error in capital cases did not go undetected and unremedied. *State v. Briggs*, 3 S.C.L. 8 (1 Brev.) (1794). Likewise, the United States Supreme Court recognizes the severity and uniqueness of capital cases. *See Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. (2d) 859 (1976). "Imposition of the penalty of death is profoundly different from all other penalties, *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 2965, 57 L. Ed. (2d) 973, 990 (1978), and, as such requires more, not fewer, procedural safeguards. . . ." *State v. Biegenwald*, 96 N.J. 630, 639, 477 A. (2d) 318, *clarified*, 97 N.J. 666, 483 A. (2d) 184 (1984). At the very least, justice demands and conscience dictates that the irretrievable extinguishment of human life by the state be preceded by a conscionable effort to be thorough, fair and reasonably certain adequate measures are maintained and observed to minimize the likelihood of an illegal execution.

The prevailing practice for appellate courts in several other jurisdictions is to overlook procedural defaults and review the trial record for reversible error prior to affirming a death sentence. *See, e.g.,* **Alabama:**

> In all cases in which the death penalty has been imposed, . . . the Supreme Court may notice any plain error or defect in the proceeding under review, whether or not

brought to the attention of the trial court, and take appropriate appellant action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner.

Ala. Rule App. Proc. 39(k).

**Arkansas:** [W]here either a sentence for life imprisonment or death [is present], the Supreme Court shall review all errors prejudicial to the rights of the appellant.

Arkansas Rev. Stat. Ann. § 43-2725 (1977).

**Florida:** [In capital cases,] [w]e will, of course, continue to review every issue presented and to conduct our own review in accordance with Florida Rule of Appellate Procedure 9.140(f).

*Cave v. State,* 476 So. (2d) 180, 183, n. 1 (Fla. 1985), *cert. denied,* 476 U.S. 1178, 106 S. Ct. 2907, 90 L. Ed. (2d) 993 (1986).

**Georgia:** [In capital cases,] [t]he Supreme Court shall review each of the assertions of error timely raised by the defendant during the proceedings in the trial court regardless of whether or not an assertion of error was presented to the trial court by motion for new trial, and regardless of whether error is enumerated in the Supreme Court.

Georgia Unified Appeal Rule IV B(2).

**Idaho:** Death is clearly a different kind of punishment from any other that [might] be imposed, and [Idaho Code] § 19-2827 mandates that we examine not only the sentence but the procedure followed in imposing that sentence regardless of whether an appeal is even taken. This indicates to us that we may not ignore unchallenged errors. Moreover, the gravity of a sentence of death and the infrequency with which it is imposed outweighs any rationale that might be proposed to justify refusal to consider errors not objected to below.

*State v. Osborn,* 102 Idaho 405, 410-411, 631 P. (2d) 187, 192-193 (1981).

**Illinois:** Ordinarily, a contention not made in the trial court is waived on appeal. . . . However, because of the qualitative difference between death and other forms of punishment . . . this court has elected to address errors in death penalty cases which might have affected the decision of the sentencing jury.

*People v. Holman,* 103 Ill. (2d) 133, 176, 82 Ill. Dec. 585, 606, 469 N.E. (2d) 119, 140 (1984), *cert. denied,* 469 U.S. 1220, 105 S. Ct. 1204, 84 L. Ed. (2d) 347 (1985).

**Indiana:** The failure to properly raise issues in the Motion to Correct Errors—generally results in a waiver of the claimed errors. . . . Since the death penalty was imposed in this case, however, we will review the state of the record concerning these questions.

*Lowery v. State,* 478 N.E. (2d) 1214, 1229 (Ind. 1985), *cert. denied,* 475 U.S. 1098, 106 S. Ct. 1500, 89 L. Ed. (2d) 900 (1986).

**Kentucky:** [I]n a death penalty case every prejudicial error must be considered, whether or not an objection was made in the trial court.

*Ice. v. Commonwealth,* 667 S.W. (2d) 671, 674 (Ky. 1984), *cert. denied,* 469 U.S. 860, 105 S. Ct. 192, 83 L. Ed. (2d) 125 (1984).

**Louisiana:** In death penalty cases, this Court has reviewed assignments of error, despite the absence of a contemporaneous objection, in order to determine whether the error "render[ed] the result unreliable," thus avoiding later consideration of the error in the context of ineffective assistance of counsel.

*State v. Hamilton,* 478 So. (2d) 123, 127, n. 7 (La. 1985), *cert. denied,* 478 U.S. 1022, 106 S. Ct. 3339, 92 L. Ed. (2d) 743 (1986).

**Missouri:** Several states hold that the general rule that allegations of court error not assigned in a motion for new trial are not preserved for appellate review, codified in Missouri Rule 29.11(d) with exceptions not applicable here, is inapplicable in death penalty cases. Even though the assignment of error has been improperly preserved,

we review, ex gratia, the point relied on for plain error . . . to determine if manifest injustice or a miscarriage of justice resulted from the denial of Nave's request for continuance.

*State v. Nave*, 694 S.W. (2d) 729, 735 (Mo. 1985), *cert. denied*, 475 U.S. 1098, 106 S. Ct. 1500, 89 L. Ed. (2d) 901 (1986).

**Pennsylvania:** Because imposition of the death penalty is irrevocable in its finality, it is imperative that the standards by which that sentence is fixed be constitutionally beyond reproach. . . . The waiver rule cannot be exalted to a position so lofty as to require this Court to blind itself to the real issue—the propriety of allowing the state to conduct an illegal execution.

*Commonwealth v. McKenna*, 476 Pa. 428, 440-441, 383 A. (2d) 174, 181 (1978).

**Utah:** [N]o objection was made to the omission. Nevertheless, as this is a capital case, we consider the defendant's contention on appeal.

*State v. Brown*, 607 P. (2d) 261, 265 (Utah 1980).

I would maintain that the death penalty is not imposed so infrequently nor the power of the state so vast that we can afford to trivalize the value of human life or our high standard of justice for the sake of expediency. In my view, the justice system has not spawned such a proliferation of safeguards as to guarantee protection against human error, and we can ill afford the cavalier abolishment of one of the few effective devices in existence. To the extent the concurrence relies upon *Horace Butler v. State, supra,* it is worth noting that, despite the other procedural protections, including *in favorem vitae,* this Court was constrained to issue extraordinary relief.

I conclude that no other protection or relief within our criminal justice system is applicable to the unique domain of *in favorem vitae,* and the doctrine should be retained as an integral part of our law.