# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Curtis J. Simms, Appellant.

Appellate Case No. 2013-001219

Appeal From Richland County
Diane Schafer Goodstein, Circuit Court Judge

Opinion No. 27528
Heard March 5, 2014 – Filed June 10, 2015

**AFFIRMED**

Jonathan S. Gasser, Chief Appellate Defender Robert
Michael Dudek, Appellate Defender Susan Barber
Hackett, and Appellate Defender David Alexander,  all of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Senior
Assistant Deputy Attorney General Salley W. Elliott, and
Solicitor Daniel Edward Johnson, all of Columbia, for
Respondent.

**CHIEF JUSTICE TOAL:**     Curtis Simms (Appellant) appeals his conviction
for high and aggravated breach of the peace, and resulting sentence.  We affirm.

# FACTUAL/PROCEDURAL HISTORY[1]

This case arises out of the tragic death of a young man, Martin Gasque (the victim), outside of Williams-Brice Stadium following the University of South Carolina football game against the University of Alabama in October 2010. Both Appellant and the victim tailgated near the stadium during the football game, and both were intoxicated as they left the area. Appellant, wearing an Alabama jersey, left the tailgate with friends, riding as the front-seat passenger in a green truck driven by a friend, Dustin Lindsey. Lindsey attempted to exit the tailgate parking lot by turning right onto Shop Road.[2] The victim—an avid Gamecock fan—was the front-seat passenger in a black truck driven by his friend Adam Paxton, and was boisterously engaging Gamecock fans through his open window as Paxton inched down Shop Road in the "bumper-to-bumper" traffic.

The two trucks and passengers crossed paths when the black truck blocked the green truck from exiting the parking lot. Lindsey blew his horn. In response, the victim threw up his hands, as if to indicate that he was sorry for blocking Lindsey's entry into the roadway. Appellant exited the green truck and approached the black truck's passenger side, where the victim was sitting. Appellant punched the victim once while he was seated in the truck, and then hit the victim four or five more times as he exited the black truck. The victim was knocked unconscious, and fell into the roadway parallel to the truck on the white line comprising the edge of the lane of traffic. After the victim hit the ground, Paxton began pulling his truck forward to the right in order to move the truck onto the shoulder of Shop Road and out of the roadway. As he did so, he unknowingly began to slowly roll over the victim between his legs, then over his groin, his abdomen, his chest, and finally, his head. Appellant yelled at Paxton to stop, and banged on the truck with his fists, but this only caused Paxton to accelerate.

---

[1] Because this appeal involves Appellant's motion for directed verdict, we view the evidence in the light most favorable to the State. *See, e.g.*, *State v. Walker*, 349 S.C. 49, 53, 562 S.E.2d 313, 315 (2002).

[2] Shop Road is one of several major thoroughfares leading in and out of Williams-Brice Stadium. In addition to providing access to the stadium, thousands of people park their vehicles, tailgate, and walk to and from the stadium along Shop Road during football games.

The victim died at the scene after suffering a hinge fracture, an injury incompatible with life, which was caused by Paxton running over him.

Due to the fact that the death occurred in the roadway, police blocked both lanes of traffic for several hours. One eyewitness testified that the line of traffic was already "bumper-to-bumper," and this incident "just added to it." A responding Sheriff's deputy testified that a large crowd of people were present at the scene and it was "pretty chaotic." Further, "pedestrians were everywhere," and "[c]rowds of people were agitated with traffic problems" and were "just constantly . . . berat[ing] the police." Another Sheriff's deputy testified that due to the "gridlock," "[it] took a while to get things moving."

Appellant was charged with both aggravated breach of the peace and involuntary manslaughter. The jury returned a verdict of not guilty on the involuntary manslaughter charge, but found Appellant guilty of aggravated breach of the peace.

The trial court sentenced Appellant to ten years' imprisonment, suspended upon the service of five years' imprisonment and three years' probation, but later reduced Appellant's sentence to ten years' imprisonment suspended upon the service of three years' imprisonment, plus three years' probation.

Appellant subsequently filed a petition for a writ of habeas corpus, which this Court denied. However, we subsequently certified this appeal from the court of appeals pursuant to Rule 204(b), SCACR.

## ISSUES

I.  Whether the circuit court erred in refusing to direct a verdict of acquittal with respect to the aggravated breach of the peace charge?

II.  Whether the trial court imposed an illegal sentence?

III.  Whether the circuit court erred in refusing to admit certain eyewitness testimony?

ANALYSIS

## *I. Directed Verdict*

At trial, Appellant moved for a directed verdict on the breach of the peace indictment because his conduct in punching the victim did not "rise to the level suggested by our legislature for [the breach of the peace] charge to go forward." The circuit court denied the directed verdict based upon the number of punches thrown by Appellant, the public nature of the incident, and the number of people who witnessed the fight. Appellant renewed his directed verdict motion at the close of his case on the same basis as his previous motion, and the trial court again denied the motion. On appeal to this Court, Appellant contends the trial court erred in denying his directed verdict because there is no evidence in the record to support the finding that there were aggravating circumstances. We find that the State presented evidence sufficient to withstand Appellant's directed verdict motion with respect to the breach of the peace charge.

A breach of the peace is a common law offense. *State v. Randolph*, 239 S.C. 79, 121 S.E.2d 349 (1961). Encompassing a broad range of conduct, South Carolina courts have analyzed a breach of the peace over the centuries as a crime defying strict definition:

> The term "breach of the peace" is a generic one embracing a great variety of conduct destroying or menacing public order and tranquility. In general terms a breach of peace is a violation of public order, a disturbance of the public tranquility, by any act or conduct inciting to violence, which includes any violation of any law enacted to preserve peace and good order.

*State v. Poinsett*, 250 S.C. 293, 297, 157 S.E.2d 570, 571 (1967) (citation omitted); *see also Randolph*, 239 S.C. at 83, 121 S.E.2d at 350 ("Breach of the peace is a common law offense which is not susceptible of exact definition."). As noted by the court of appeals in *State v. Peer*:

> Throughout the various definitions appearing in the cases there runs the proposition that a breach of the peace may be generally defined as such a violation of the public order as amounts to a disturbance of the public tranquility, by act or conduct either directly having this effect, or by inciting or tending to incite such a disturbance of the public

tranquility. Under this general definition, therefore, in laying the foundation for a prosecution for the offense of breach of the peace it is not necessary that the peace actually be broken; commission of an unlawful and unjustifiable act, tending with sufficient directness to breach the peace, is sufficient.

320 S.C. 546, 552, 466 S.E.2d 375, 379 (Ct. App. 1996) (citing 12 Am. Jur. 2d *Breach of Peace & Disorderly Conduct* § 4 (1964)). "Whether conduct constitutes a breach of the peace depends on the time, place, and nearness of other persons." *Id.* (citing 3 S.C. Juris. *Breach of Peace* § 7 (1991)). However, despite including "acts likely to produce violence in others, actual violence is not an element of breach of peace." *Id.* (citations omitted); *see also State v. Langston*, 195 S.C. 196, 11 S.E.2d 1 (1940).

Normally, a breach of the peace is a misdemeanor punishable in magistrate's court by a fine "not exceeding five hundred dollars or imprisonment for a term not exceeding thirty days, or both . . . ." S.C. Code Ann. § 22-3-560 (Supp. 2013). When, however, the breach of the peace is deemed to be of a high and aggravated nature, the case may be "waived up" to the Court of General Sessions:

Magistrates may cause to be arrested (a) all affrayers, rioters, disturbers and breakers of the peace, (b) all who go armed offensively, to the terror of the people, (c) such as utter menaces or threatening speeches and (d) otherwise dangerous and disorderly persons. Persons arrested for any of such offenses shall be examined by the magistrate before whom they are brought and may be tried before him. If found guilty they may be required to find sureties of the peace and be punished within the limits prescribed in § 22-3-560 or, *when the offense is of a high and aggravated nature, they may be committed or bound over for trial before the court of general sessions*.

S.C. Code Ann. § 22-5-150 (Supp. 2013) (emphasis added); *cf. id.* § 22-5-110(A)(3) (Supp. 2013) (requiring a magistrate to "commit or bind over for trial those who appear to be guilty of crimes or offenses not within their jurisdiction").

Thus, a simple breach of the peace is a common law offense defined in our precedents in broad terms. Where aggravating circumstances exist, however, the General Assembly has permitted a defendant to be prosecuted in circuit court, as happened here. *See* S.C. Code Ann. § 22-5-150. It makes no difference that the

aggravators are not expressly defined by statute. Rather, the law only requires that a breach of the peace be "of a high and aggravated nature." Thus, a wide variety of factual circumstances could render a simple breach of the peace triable in circuit court because of its "high and aggravated nature."

Here Appellant was indicted for "Breach of Peace - High and Aggravated."[3]

---

[3] The dissent would find that Appellant cannot be convicted of a high and aggravated breach of the peace under South Carolina law because the specific language used in the indictment is not found in our criminal law, and where such crime is listed elsewhere in South Carolina law as "aggravated breach of peace" or just "breach of the peace." *See, e.g.*, *State v. Mason*, 108 S.C. 410, 94 S.E. 870 (1918) (affirming a conviction for "aggravated" breach of the peace).

We begin by noting the points of our analysis on which the dissent agrees. First, the dissent agrees that the crime of breach of the peace is a creature of the common law. Second, the dissent agrees that section 22-5-150 directs that some breach the peace offenses should be tried in the Magistrate's Court and others should be tried in circuit court *due to their high and aggravated nature*.

Because we agree on these fundamental points, then all that remains—its convoluted analysis notwithstanding—is that the dissent simply opposes the indictment's reference to Simm's crime as a "Breach of Peace - High and Aggravated." Thus, our entire disagreement is a matter of semantics. Where the dissent would find the State was creating (and we are now sanctioning) an entirely new crime, we find that by including the requisite jurisdictional language of "high and aggravated" in the indictment, the State was merely providing Simms with notice of the crime for which it sought to prosecute him in circuit court—a ***breach of the peace*** that was aggravated, or serious enough, to be "waived up." *State v. Gentry*, 363 S.C. 93, 102, 610 S.E.2d 494, 499–500 (2005) ("The indictment is the charge of the state against the defendant, the pleading by which he is informed of the fact, and the nature and scope of the accusation . . . . The indictment is a notice document." (quoting *State v. Faile*, 43 S.C. 52, 59–60, 20 S.E. 798, 801 (1895), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991))).

At the end of the day, the dissent's complicated analysis is undermined by faulty logic. We do not understand how the majority can be charged with creating a new crime when the dissent agrees that the crime for which Simms was prosecuted

The indictment states:

> That [Appellant] did in Richland County on or about October 9, 2010, knowingly, willfully and intentionally disturb public order and/or public tranquility through his conduct, accompanied by circumstances of aggravation, fighting in the roadway and/or disrupting traffic such acts constituting the offense of Breach of Peace in violation of the Common Law of South Carolina.

Considering the time, place, and nearness of others as required by *Peer*, we find that the trial court did not err in refusing to direct a verdict of acquittal regarding the aggravated breach of the peace charge, because the State presented evidence of aggravation. *See State v. Cherry*, 361 S.C. 588, 593, 606 S.E.2d 475, 478 (2004) (stating that in cases where the State has failed to present evidence of the offense charged, a criminal defendant is entitled to a directed verdict); *State v. Burdette*, 335 S.C. 34, 46, 515 S.E.2d 525, 531 (1999)) (stating when reviewing a denial of a directed verdict, an appellate court must view the evidence and all reasonable inferences in the light most favorable to the state).

The fight and the victim's subsequent death occurred in a public roadway immediately adjacent to Williams-Brice Stadium after a football game attended by a capacity crowd. At the time, thousands of fans were attempting to exit all corners of the stadium on foot and in vehicles. Moreover, the resultant melee caused previously slow-moving traffic to come to a standstill for over two hours, as the fight occurred on a particularly busy thoroughfare. Further, many members of the public witnessed the victim's death. Several witnesses testified to the extremely disturbing nature of the crime scene. Ultimately, Appellant's direct involvement in the incident, which led to the victim's unfortunate demise, contributed to the distress of many members of the community, and the general public upheaval that followed. Thus, Appellant's actions exemplify the type of behavior constituting an aggravated breach of the peace.

Accordingly, we affirm the circuit court's refusal to grant Appellant's directed verdict motion.

---

already exists. Furthermore, the adoption of the dissent's analysis would produce the absurd result that simple breaches of the peace may be prosecuted in South Carolina, but serious breaches of the peace may not.

## II. Sentence

Appellant contends the maximum sentence he could have been subjected to for a conviction of aggravated breach of the peace in circuit court is thirty days, citing section 22-3-560 of the South Carolina Code. *See* S.C. Code Ann. § 22-3-560 (Supp. 2013) ("Magistrates may punish by fine not exceeding five hundred dollars or imprisonment for a term not exceeding thirty days, or both, all breaches of the peace."). We disagree.

Appellant relies on the language of section 22-3-560 that permits magistrates to punish "*all breaches of the peace*." (Emphasis added). Specifically, Appellant argues that thirty days and $500 fine is the maximum sentence for *any* breach of the peace.

However, Appellant's argument ignores the clear language of sections 22-5-150 and 22-5-110(A)(3), which suggest that once the defendant has been "waived up" to circuit court, the magistrate loses jurisdiction. Thus, while section 22-3-560 applies to all breaches of the peace tried in magistrate's court, it does not affect sentencing in circuit court. Accordingly, because no sentence is specified for aggravated breach of the peace under our criminal law, section 17-25-30 of the South Carolina Code controls. *See* S.C. Code Ann. § 17-25-30 (Supp. 2013). That section provides:

> In cases of legal conviction when no punishment is provided by statute the court shall award such sentence as is conformable to the common usage and practice in this State, according to the nature of the offense, and not repugnant to the Constitution.

*Id.*

Because Appellant's sentence fell safely within the limits of section 17-25-30, we affirm the sentencing by the trial court. *See, e.g.*, *State v. Hill*, 254 S.C. 321, 175 S.E.2d 227 (1970).

## III. Evidentiary Ruling

Finally, Appellant contends the trial court erred in refusing to allow a witness who was riding in the car directly behind the victim to testify regarding his personal observations of the victim in the hour leading up to the fight. The witness

would have testified that he saw the victim harass Alabama fans on foot as he rode past them in his vehicle and exit his vehicle to urinate in the roadway before the fight.

Appellant argues that the circuit court erred in excluding the witness's testimony because it impeached other testimony elicited at trial that the victim was not acting in a disorderly fashion, and because it was "part of the fabric of the case." Appellant was acquitted of the involuntary manslaughter charge, and whether or not the victim also engaged in a breach of the peace is irrelevant to *Appellant*'s indictment for high and aggravated breach of the peace, as the victims of a breach of the peace are members of the public. Because this evidence is irrelevant to the question of Appellant's guilt for high and aggravated breach of the peace, we find any error in the circuit court's refusal to admit the testimony was harmless.

Accordingly, we affirm the circuit court's decision to exclude this testimony. *See State v. Gaster*, 349 S.C. 545, 557, 564 S.E.2d 87, 93 (2002) (stating the admission or exclusion of evidence rests in the sound discretion of the trial judge, and will not be reversed on appeal absent an abuse of discretion (citation omitted)); *see also State v. Kelly*, 319 S.C. 173, 176, 460 S.E.2d 368, 370 (1995) ("A trial judge has considerable latitude in ruling on the admissibility of evidence and his rulings will not be disturbed absent a showing of probable prejudice." (citation omitted)).

## CONCLUSION

Based on the foregoing, Appellant's conviction for high and aggravated breach of the peace and resulting sentence are

**AFFIRMED.**

**BEATTY AND KITTREDGE, JJ., concur. PLEICONES, J., dissenting in a separate opinion in which HEARN, J., concurs.**

**JUSTICE PLEICONES:** I respectfully dissent because I find there is no criminal offense denominated "high and aggravated breach of the peace" (BPHAN) cognizable in circuit court. Since there is no such offense, I would vacate appellant's conviction and sentence. *See*, *e.g.*, *State v. Sutton*, 340 S.C. 393, 532

S.E.2d 283 (2000) ("conviction" of an offense not recognized in South Carolina is void for lack of subject matter jurisdiction).[4]

The majority concludes that BPHAN is a common law offense. While I acknowledge that this Court has the ability to create such a crime if it chooses,[5] I find no evidence that we have done so.[6] My conclusion that BPHAN is not a criminal offense in South Carolina is based upon my review of the common law understanding of breach of the peace, and the nature of the statutes upon which the majority relies to find the legislature has permitted BPHAN to be prosecuted in General Sessions.[7]

I begin my analysis with the Reception Statute. This statute, enacted in 1712 by the General Assembly of the Colony of South Carolina, adopted English common law as the law of South Carolina. The Reception Statute is currently codified at S.C. Code Ann. § 14-1-50 (1976).[8]

---

[4] Were I to reach the merits of appellant's directed verdict issue, my analysis would be confined to a review of the evidence of aggravated breach of the peace up to the point of the victim's death, and not with the "resultant melee" or the "many members of the public [who] witnessed the victim's death," or "the extremely disturbing nature of the crime [sic] scene." Because the jury absolved appellant of criminal responsibility for that tragedy, the consequences of the victim's death are not attributable to appellant for purposes of the directed verdict motion.

[5] "The Court has the right and the duty to develop the common law of South Carolina to better serve an ever-changing society," including recognizing new criminal offenses. *State v. Horne*, 282 S.C. 444, 319 S.E.2d 703 (1984) (recognizing new common law offense of feticide).

[6] The single reference to BPHAN in our jurisprudence is found in *State v. Mason*, 108 S.C. 410, 94 S.E. 870 (1918). The *Mason* opinion states the defendant was indicted and convicted of assault and battery with intent to kill and aggravated breach of the peace. Unfortunately the transcript and briefs from this period, including Mason's indictments from 1916 and 1918, were destroyed in a flood and thus it is impossible to confirm the actual aggravated offense for which Mason and his codefendant Davis were indicted and convicted.

[7] I regret that the majority has difficulty following my convoluted and complicated analysis. Were they able to do so, they would not conclude that my logic is faulty.

[8] **Common law of England shall continue in effect.** All, and every part, of the common law of England, where it is not altered by the Code or inconsistent with

In 1712, as today, breach of the peace occupies an unusual status in England as a civil "offense." In order to hold that BPHAN is a common law **criminal** offense in South Carolina, we must find the opinion in which the Court recognized and defined this offense. *State v. Horne*, *supra*. I suggest that there is no such opinion.[9]

At common law, an individual may be arrested for breach of the peace if a breach has occurred, or if one is imminent. An English police officer arresting an individual for breach of the peace may either detain the individual until the threat of breach has passed, or bring the individual before a magistrate to be "bound over" to keep the peace or to be of 'good behavior' or both. *See Albert v. Lavin* [1982] A.C. 546. While an individual may be arrested, detained, or placed under a surety bond if he breached or threatened the peace, breach of peace is not a criminal offense at common law in England. As Blackstone explained:

> Any justice of the peace may, *ex officio*, bind all those to keep the peace who in his presence make any affray, or threaten to kill or beat another, or contend together with hot and angry words, or go about with unusual weapons or attendance, to the terror of the people; and all such as be known to be common barretors; and all as are brought before him by the constable for a breach of the peace in his presence; by causing the person to post a surety as security for the peace.

*4 Blackstone's Commentaries on the Laws of England* pp. 254-255.

When South Carolina received the common law in 1712, we accepted the concept of breaches of the peace as non-criminal offenses, but nonetheless acts which subjected an individual to arrest. For example, from 1895 until 1976, the state constitution defined a magistrate's jurisdiction to include "the power to bind over to keep the peace and for good behavior for a time not to exceed twelve months." S.C. Const. art. V, § 21 (1895); *see State v. Garlington*, 56 S.C. 413, 34 S.E. 689 (1900) (authority of magistrate to commit to jail in lieu of requiring peace bond).

_____

the Constitution or laws of this State, is hereby continued in full force and effect in the same manner as before the adoption of this section.

[9] If I am correct, and it is with this decision that we create BPHAN, then we must reverse appellant's conviction as a new common law crime applies only prospectively. *State v. Horne*, *supra*.

This understanding of non-criminal breach of the peace as a matter within the magistrate's jurisdiction is confirmed by an opinion of the Attorney General. In a 1969 opinion,[10] he explained the peace bond process under the 1895 Constitution. A person arrested for breach of the peace was brought before a magistrate who, upon a showing that the person was likely to commit a crime, could place that individual under a surety bond. The duration of the bond could not exceed one year, and if the individual failed to post the bond, then the individual could be committed to jail by the magistrate for a period up to a year. The individual was released only when the bond was posted, the surety period expired, or the magistrate so ordered. *See also State v. Garlington*, *supra*. The opinion further states that should the individual violate the terms of his surety bond by breaching the peace, he could not be incarcerated for that breach although the bond or part of it could be forfeited. Instead, the individual could only be criminally punished for the specific crime he committed which breached the terms of his bond. *See also* 4 *Blackstone's Commentaries* at pp. 252-53.

While no longer a part of our State Constitution, the practice of permitting magistrates to place individuals under peace bonds is retained by statute. South Carolina Code Ann. § 22-5-140 (2007)[11] authorizes a magistrate to require a "peace bond" to ensure an individual keeps the peace or to jail that person if he does not post the bond. *Cf. State v. Garlington*, *supra* (same procedure under 1895 Const. art. 5, § 21).

In addition to continuing the "peace bond" practice, § 22-5-140 acknowledges a magistrate's authority to require those engaged in "riotous or disorderly conduct" "to answer to an indictment." Section 22-5-140, which authorizes the magistrate to refer "rioters" or "disorderly conductors" to the solicitor, is followed by S.C. Code Ann. § 22-5-150 (2007), titled "**Arrest of persons threatening breach of peace; trial or binding over.**" This section provides:

---

[10] 1969 Atty. Gen. Op. No. 2720 p. 171.

[11] The text of § 22-5-140 provides:

> Any magistrate shall command all persons who, in his view, may be engaged in riotous or disorderly conduct to the disturbance of the peace, to desist therefrom and shall arrest any such person who shall refuse obedience to his command and commit to jail any such person who shall fail to enter into sufficient recognizance either to keep the peace or to answer to an indictment, as the magistrate may determine.

Magistrates may cause to be arrested (a) all affrayers,[12] rioters,[13] disturbers and breakers of the peace, (b) all who go armed offensively, to the terror of the people, (c) such as utter menaces or threatening speeches and (d) otherwise dangerous and disorderly persons.  Persons arrested for any of such offenses shall be examined by the magistrate before whom they are brought and may be tried before him.  If found guilty they may be required to find sureties of the peace and be punished within the limits prescribed in § 22-3-560 or, when the offense is of a high and aggravated nature, they may be committed or bound over for trial before the court of general sessions.

Section 22-5-150 lists the criminal offenses which are traditionally categorized as "Offenses Against the Public Peace," e.g., affrays, riots, and disturbing the peace. *See* Russell, *A Treatise on Crimes & Misdemeanors* (8th Am. ed. 1857); 4 *Blackstone's Commentaries* Chapter 11, *passim.*  An individual who commits or threatens to commit any of these acts is subject to arrest and to being placed under a peace bond.  The individual may also be referred to the solicitor for prosecution.  Under the statute, that prosecution would be for the affray, riot, or other named

offense, and not for breach of the peace.  While appellant's indictment twice references § 22-5-150, it does not charge him with any of these named offenses.[14]

As explained below, I believe history supports my reading of sections 22-5-140 and -150.  Both sections 22-5-140 and -150 derive from 1870 Act No. 288 (402).

---

[12] An affray is a fight between two or more persons in a public place, "to the terror of the people."  *State v. Sumner*, 36 S.C.L. (5 Strob.) 53 (1850).

[13] A riot is "a tumultuous disturbance of the peace, by three or more persons assembled together, of their own authority, with the intent mutually to assist each other against anyone who shall oppose them, and putting their design into execution in a terrific and violent manner, whether the object was lawful or not . . . ."  *State v. Connolly*, 37 S.C.L. (3 Rich.) 337 (1832); *see also State v. O'Donald*, 12 S.C.L. (1 McCord) 532 (1822) (arrest of judgment where riot indictment only named two people).

[14] To put it another way, a person charged with the criminal offense of breach of the peace is not subject to being waived up to General Sessions under the plain language of § 22-5-150.  This "omission" reflects the purely civil nature of breach of the peace in 1870 when the statute was adopted, a status that did not change until 1940.  *See* note 20, *infra*.

This Act defined the jurisdiction of Trial Justices, the predecessors to magistrates, and provides the foundation for our current magistrate's court statutes. This Act provided in pertinent part:

> Sec. 2.[15] Trial Justices shall have jurisdiction of all offences which may be subject to the penalties of either fine or forfeiture not exceeding one hundred dollars, or imprisonment in the Jail or Work House not exceeding thirty days, and may impose any sentence within those limits, singly or in the alternative.
>
> Sec. 3.[16] They may punish by fine not exceeding one hundred dollars, or imprisonment in the Jail or House of Correction not exceeding thirty days, all assault and batteries, and other breaches of the peace, when the offence is not of a high and aggravated nature, requiring, in their judgment, greater punishment.
>
> Sec. 4.[17] They may cause to be arrested all affrayers, rioters, disturbers and breakers of the peace, and all who go armed offensively, to the terror of the people, and such as utter menaces or threatening speeches, or otherwise dangerous and disorderly persons.
>
> Persons arrested for any of said offences shall be examined by the Trial Justice before whom they are brought, and may be tried before him, and, if found guilty, may be required to find sureties of the peace, and be punished within the limits prescribed in Section 2, or, when the offence is of a high and aggravated nature, they may be committed or bound over for trial before the Court of General Sessions.

In *State v. McKettrick*, 14 S.C. 346 (1880), the Court explained that, among other things, 1870 Act No. 288 divided assaults and batteries into two classes: those of a high and aggravated nature and others "below that grade," the lesser offenses lying within the exclusive jurisdiction of the Trial Justices [i.e., magistrates] and the high

---

[15] The jurisdiction of magistrates is now found in S.C. Code Ann. § 22-3-550 (Supp. 2014).

[16] The statute defining the criminal sentencing limits for breaches of the peace tried in magistrates' court is now found in S.C. Code Ann. § 22-3-560 (Supp. 2014).

[17] Section 4 is now codified in § 22-5-150.

and aggravated within the exclusive jurisdiction of the court of general sessions. Further, *McKettrick* explains that the Trial Justice must refuse to adjudicate a "high and aggravated" assault and battery but instead must "send the case up" to General Sessions. *McKettrick*, 14 S.C. at 354; *see State v. Sims*, 16 S.C. 486 (1886) (explaining that general sessions has jurisdiction to try only high and aggravated rioters).

Just as Act No. 288 divided assaults and batteries into two classes, it also divided offenses which breach the peace into two jurisdictional categories, simple breaches triable in magistrates' courts and high and aggravated breaches triable in General Sessions. *McKettrick*, *supra* (assaults and batteries); *Sims*, *supra* (riots). However, Act No. 288 did not create a new magistrate level crime called "breach of the peace" nor did it create a new General Sessions offense known as "breach of the peace of a high and aggravated nature."[18] As the Court explained in *State v. Robinson*, 31 S.C. 453, 10 S.E. 101 (1889) the term "assaults and batteries and other breaches of the peace of a high and aggravated nature [used in the Act]. . . [did not] create a new and distinct offense of that character; but rather, [the term] indicate[s] a class of cases of which the court of general sessions had jurisdiction." *Id*. at 456, 10 S.E. at 102. Section 22-5-150 reflects the jurisdictional boundary between circuit court and magistrates' court for criminal breaches of the peace, a division created by 1870 Act No. 288. *E.g.*, *State v. Grant*, 34 S.C. 109, 12 S.E. 1070 (1891).

That our law retains the principle that persons whose criminal offense breaches the peace in a "high and aggravated" manner should be referred to General Sessions is reflected in Title 16 as well as in Title 22. Certain offenses named in Section 4 of 1870 Act No. 288 as breaching the peace, and found today in § 22-5-150, are also found in Title 16, Chapter 5, titled "Offenses Against Civil Rights." *See* § 16-5-120 (establishing additional penalty for unarmed person who is convicted of "engaging in a riot, rout,[19] or affray") and § 16-5-130 (Riot).[20] Consistent with § 22-5-150's division of offenses which breach the peace into those triable in magistrate's court and those of a high and aggravated nature which should be

---

[18] Had the Act created the crimes, we would be concerned with a statutory offense rather than a common law one.

[19] A rout differs from a riot in that the defendants meet and "do not actually execute their purpose, but only make some motion towards its execution." *State v. Sumner*, 29 S.C.L. (2 Speers) 599 (1844). Unlawful assembly is a lesser included offense of rout. *Id.*; *State v Brazil*, 24 S.C.L. (Rice) 257 (1839).

[20] See footnote 9 and 10, *supra*, defining these terms.

bound over to General Sessions, § 16-5-140 requires persons arrested for violation of an "Offense Against Civil Rights" be brought "for a trial before such court as shall have jurisdiction of the offense." In other words, § 16-5-140 recognizes that "Offenses Against Civil Rights" are properly tried either in magistrate's court or in General Sessions, depending upon the aggravated nature of the defendant's conduct. *See also* 1895 S.C. Const. art. V, § 18 recognizing concurrent jurisdiction of circuit court and magistrates' court "in all cases of riot, assault and battery, and larceny . . . ."

While the common law did not recognize a criminal offense known as "breach of the peace" in 1712, nor does England today, South Carolina has come to acknowledge a common law offense with this name. The origin of this common law crime is not clear, but it appears to have evolved from our use of the generic term "breach of the peace" to identify the criminal act committed by the defendant,[21] where the underlying criminal conviction was either for the violation of an ordinance forbidding disturbing the peace,[22] or for one of the criminal offenses generally categorized as "Offenses Breaching the Peace." Over time, "breach of the peace" has evolved into a synonym for "disturbing the peace."[23]

---

[21] *See e.g. Lining v. Bentham*, 2 S.C.L. (2 Bay) 1 (1796) (referring to a non-party as having been guilty of a breach of the peace).

[22] *See, e.g., State v. Praser*, 173 S.C. 284, 175 S.E. 551 (1934).

[23] The first reported decision stating the defendants were convicted in magistrate's court of the crime of breach of the peace, and defining that crime, is *State v. Langston*, 195 S.C. 190, 11 S.E.2d 1 (1940). The definition in *Langston* is taken from "Kansas v. Herbert," annotated in 48 A.L.R. 85. *Id*. However, the defendant in the Kansas case referenced in *Langston*, was actually convicted of "disturbing" the peace, and it is the definition of that offense which is adopted in *Langston*. *See State v. Herbert*, 246 P.2d 507 (Kan. 1926). To the extent *Langston* relies on South Carolina civil decisions for its definition of the crime of breach of the peace, those cases are inapposite. In those cases, the plaintiff claimed the defendant had committed a trespass *quare clausum fregit* when repossessing its property, and the defendant asserted as its defense that the repossession had been peaceful. *See, e.g., Lyda v. Cooper*, 169 S.C. 451, 169 S.E. 236 (1933); *Childers v. Judson Mills Store Co.*, 189 S.C. 224, 200 S.E. 770 (1939); s*ee also Jordan v. C&S Nat'l Bank of S.C.*, 278 S.C. 449, 298 S.E.2d 213 (1982) (holder of chattel mortgage may retake property either peacefully or by claim and delivery proceedings). Our criminal opinions continue to rely, erroneously in my opinion, on these civil cases when defining the crime of breach of the peace. *See, e.g., State v. Peer*, 320 S.C. 546,

However, there is nothing in this Court's decisions to suggest that concomitant with our recognition of a common law magistrate's level offense denominated "breach of the peace" that we also created a new crime known as "high and aggravated breach of the peace," punishable in General Sessions. Instead, as explained above, the statutory reference to high and aggravated breach of the peace derives from an Act directing that some offenses which breach the peace should be tried in the magistrates court and others in General Sessions. § 22-5-150.

My review of the common law history of breach of the peace, including the Court's decisions, and my review of related South Carolina statutes and the 1895 Constitution, convinces me that this Court has not created a common law criminal offense cognizable in General Sessions denominated "Breach of the Peace of a High and Aggravated Nature." I would therefore vacate appellant's conviction and sentence for this non-existent crime.

**HEARN, J., concurs.**

---

466 S.E.2d 375 (Ct. App. 1996). In addition, our cases cite to *Cantwell v. Connecticut*, 310 U.S. 296 (1940) for the definition of the common law offense of breach of the peace. *Cantwell* notes that breach of the peace is "a common law concept of the most general and undefined nature," that punishes "violent acts" and "acts and words that destroy or menace public order and integrity." The Court stated that "When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order appears, the power of the State to prevent or punish is obvious." Further, the Court was careful to note in discussing the state conviction for common law breach of the peace that "The court below has held that petitioner's conduct constitutes the commission of an offense under state law, and we accept its decision as binding upon us to that extent." *Id*. at 308.